## HAMMOND vs. THE ST. LOUIS PUBLIC SCHOOLS.

*Ejectment:* — The plaintiff, "The St. Louis Public Schools," claimed the land in controversy under the act of Congress of 13th June, 1812, entitled, "An act making further provision for settling the claims to lands in the territory of Missouri," and the act supplementary thereto, of May 26th, 1824; the first of which acts confirmed to the inhabitants of the town of St.Louis, &c., their rights, titles and claims to town or village lots, out-lots and common-field lots, in said town, which had been inhabited, cultivated, or possessed prior to the 20th December, 1803, and also "reserved" all town or village lots, out-lots, or common-field lots not rightfully owned or claimed by private individuals, for the support of schools in the respective towns and villages; under the last of which acts, the land in controversy was designated and set apart to the plaintiff, for the use of schools.

Defendant claimed the property under Madame Lachaisse, who had exhibited her claims to the first board of commissioners, under a concession which was, by the board, rejected. Afterwards, the recorder of land titles, under the act of 13th June, 1812, reported the claim to Congress for confirmation, and it was confirmed by the act of 29th April, 1816. *Held:*

1. That the second section of the act of 13th June, 1812, which reserves vacant lots for the use of schools, does not pass the legal title to the property so reserved, from the United States.

2. That, under this section, the power to determine in favor of an individual, that he is the rightful claimant of a lot, and that it is not embraced in the reservation, is retained by the Government.

3. That the claim of Madame Lachaisse having been confirmed by the act of 29th April, 1816, the fee passed by that act, and the reservation for the use of schools no longer applied to the property.

TOMPKINS, *Judge,* delivered a separate opinion, embracing other questions than those decided by the Court.

## APPEAL from St. Louis Court of Common Pleas.

SPALDING, *for Appellant.*

POINTS FOR THE APPELLANT.

1. The plaintiff below had right of possession only of such land as was reserved for the use of schools in the second section of the act of Congress of 13th June, 1812, "making further provision for settling the claims to land in the territory of Missouri."— 2 Story's Laws, 1257, act of 13th June, 1812; 3 Story's Laws, 1972, act of 26th May, 1824; 4 Story's Laws, 2220, act of 27th Jan., 1831; Act of General Assembly of Missouri of Feb. 13th, 1833, p. 37.

2. The lands reserved for the use of schools by the second section of the act of Congress of 13th June, 1812, are confined to what was either a *town* or *village lot, out-lot,* or *common-field lot,* on 20th December, 1803.— 6 Miss. Rep., 292-4, 297; 3 Story's Laws, 1792, sec. 2.

3. If the reservation in the second section of the act of 13th June, 1812, embraces town or village lots, out-lots, and common-field lots of the respective towns, as they were at the date of the passage of that act, it is yet to be confined to the *towns* or *villages,* properly so called, and does not refer to the limits of them

9

as incorporated under the American government, which, as in the case of St. Louis may contain several square miles of land lying in the neighborhood of the town proper.—Hempstead's Digest, 256; "An act concerning towns in this territory," passed June 18, 1808.

4. Margaret Lachaisse acquired a title to the land in question by the acts of the recorder of land titles, ratified by the act of Congress of 29th April, 1816.— 3 Story's Laws, 1604; 1 Miss. Reports, 777.

The second section of act 13th June, 1812, does not take away the right from Congress of passing the title of the land therein reserved. Said section does not reserve the land in question, because it was "rightfully claimed" by Madame Lachaisse, under a Spanish 'grant.

5. The doctrine applied in the case of Wilcox *vs.* Jackson, in 13 Peters' Rep., 511, is not applicable here: that was, that the ministerial officer could not sell lands reserved from sale by law. But here Congress itself has removed its own prohibition, if the second section of the act of 13th June, 1812, embraced the ground in question.—2d vol. State Papers, "Public Lands," 388–559; 563– 603, for "Commissioner's Reports;". 3d vol. State Papers, 274, "Recorder's Reports," the first part thereof, containing village claims, &c.; *Ibid.*, 293, second part; *Ibid.*, 276 and 280.

6. The reservation in second section of act of 13th June, 1812, is not a *dedication* to public use, but is merely an expression of the benevolent intention of the Government; it is a mere reservation. All the instances of *dedication* are of *designated* pieces of property, and of property *used* for the public in some particular mode; and the party, in such cases, is estopped from resuming the land *dedicated*, inasmuch as the *interests* of others, third persons, have become vested on the faith of such dedication.—10 Peters' Rep., 720; 6 Peters' Rep., 438.

GEYER and GAMBLE, *for Appellees.*

The appellees rely upon the following points and authorities:—

1. The record of the proceedings of the Court of Common Pleas, being duly certified, is in its nature competent, and it is relevant to the issue, to ascertain the limits of the town of St. Louis on the 13th June, 1812, since it is to the then inhabitants that grants are made by the first section, and the reservation in the second section is for the support of schools in the town, not as it was at any antecedent period, but as it was when the act passed: and, moreover, the survey to be made by the first section is to be the out-boundary lines of the town, (as it then was) to be extended, if necessary, so as to include out-lots, &c., belonging thereto.—2 Story's Laws U. S., 1257.

2. The plats and surveys given in evidence by the plaintiffs, and objected to by the defendant, are "copies of plats and surveys," required by law to be deposited and kept in the office of the surveyor of the lands of the United States in this State. (Story's Laws U. S., vol. ii., 1257; vol. iii., 1973; vol. iv., 2220.) They were duly certified by said surveyor, and, therefore, must be received in evidence.—Revised Code Missouri, 1835, p. 251.

3. The letter of instructions, by the commissioner to the surveyor, is written under the authority of law. (Story's Laws U. S., vol. ii., 1257; iii., 1973.) The original is a paper required by law to be deposited and kept in the office of surveyor; a copy, duly certified by him, is competent evidence. (Rev. Code, 1835, 251.) The original is a public document, and, as such, cannot be removed from one place to another, nor the production in court compelled, and a copy is there, when proved, as in this case, competent evidence. (1 Starkie's Ev., 156, 7, 160, 1.)

On general principles of law, a copy of a paper given by a public officer whose duty it is to keep the originals, ought to be received in evidence.— United States *vs.* Perkman, 7 Peters, 53.

4. The documents objected to by the defendant, being duly authenticated, were competent evidence; and if there be anything in either of them incompetent or irrelevant to the issue, that matter ought to have been specially objected to.

5. The act of the 13th June, 1812, disposes of all the lots, out-lots, and common-field lots, and commons, in, adjoining to, and belonging to the town of St. Louis, included within the out-boundaries of the survey directed to be made by the first section of the act, and which had not before been granted or confirmed by the board of commissioners. Those lots which were inhabited, cultivated, or possessed prior to the 20th December, 1803, it grants to individual claimants, and all others it reserves for the support of schools, subject, however, to a selection by the president for military purposes.— Story's Laws U. S., vol. ii., p. 1257.

6. The act of the 13th June, 1812, contemplated no further action by the recorder in relation to lots; whatever lots Congress intended to be confirmed, are confirmed by the first section of the act *proprio vigore*, and all not confirmed by that section are reserved by the second section. The recorder had no power whatever over these lots.— Benton *vs.* Vasseur, 1 Mo. Dec., 300; Strother *vs.* Lucas, 12 Peters, 454.

7. If no portion of the piece of ground in controversy was a lot before the 20th Dec., 1803, as supposed in the fourth instruction asked for by the defendant, it would follow, that Mad. Lachaisse could have no title to it under the act of 13th June, 1812; (see Newman *vs.* Lawless, decided by this Court;) but it would that the defendant was entitled to a verdict. The second section refers to the *then present;* the language is, "lots, &c., included within such survey, which *are not* rightfully owned or claimed by any private individual, &c., are reserved for the use of schools." A piece of ground which was not a lot in 1803, therefore, though inhabited and cultivated prior to that period, becomes a school lot precisely for the reason that it cannot be rightfully claimed as the lot of an individual.

8. If the piece of ground in controversy was not a lot of either description in 1803, which is probable, since the ground between the two fortifications was kept vacant under a reservation for military purposes, yet, if the certificate of Soulard, given in evidence by the defendant, proves any thing, it proves that Main-street extended along the whole front of the ground, and that a cross street, also, was to be located there; so that the ground in controversy was then a lot, and it is proved that it was a lot in 1809 or 10, whether a town lot or out-lot is immaterial.

9. Whether the land in controversy is to be regarded as having been a lot in 1803, or otherwise, is immaterial, since it was not inhabited, cultivated, or possessed prior to 20th December, was not confirmed to any one by the commissioners, nor held by a complete grant, and, consequently, was "not rightfully owned or claimed by any private individual" on the 13th June, 1812, and is therefore reserved by the second section, and appropriated to the purposes therein declared.

10. On the 13th June, 1812, the ground in controversy was a lot, separated by established boundaries from all other lands. A piece of land with defined boundaries, whatever its shape, is a lot; and this was bounded, as all the lots east of Main-street are, west by Main-street; on one side by a street, and on the other by the land of some other persons, and east by the river; and not being then rightfully claimed by any individual, is appropriated to the uses expressed in the second section.

11. Every statute ought to be construed according to the intent thereof of the legislature, rather than the letter. (3 M. & S., 510; 2 T. Rep., 161; The People *vs.* Union Ins. Comp., 15 John. Rep., 358.) A thing within the intention is as much within the statute, as if it were within the letter; (Bac. Abr., tit., "Statute," letter I., Coonce *vs.* Mundoy, 3d vol. Mo. Dec., 373; *Ibid.*, p. 496;) applying these rules to the interpretation of the act of 13th June, 1812, that all lands within the out-boundary of the survey directed by the first section, which were not, on the 13th June, 1812, rightfully claimed or owned by any individual, are reserved for the declared purposes. This appears, by excepting the commons, which certainly might well be said not to be a village lot, out-lot, or common-field lot; but the exception shows that Congress understood that the commons would have been within the appropriation, if not excepted. The object of the appropriation shows the intent of Congress to reserve all vacant lands.

12. The recorder of land titles had no authority to select lands confirmed by the act of 1812, or appropriated by it. His selection and confirmation of Mad. Lachaisse's claim is a mere nullity. (1 Mo. Dec., 300; 12 Peters, 454.) The act of the recorder vested in Mad. Lachaisse, and those claiming under her, no better title than they had previously.

13. The second section of the act of 13th June, 1812, made an appropriation of all the lands within the boundary of the survey directed by the first section, not rightfully claimed by individuals, or held as commons, and from that moment the land thus appropriated became severed from the mass of the public lands, and no subsequent law, proclamation, or sale will be construed to embrace or operate upon it, (Wilcox *vs.* Lessee of McConnell, 13 Peters, 490,) and therefore the recorder not only had no power over it, but, if his recommendation is embraced in the report confirmed by the act of April, 1816, that act will not be construed to confirm the claim, although it makes no reservation.

14. The section of the act of June, 1812, not only made an appropriation to which the faith of the nation was pledged, so that Congress cannot be supposed to have intended a breach of that faith, but from the moment of the passage of the act, the lands appropriated by the second section were held by the United States, in trust

for the inhabitants of the several towns and villages, subject only to such reservations as the president might make for military purposes; and Congress could not, if it would, make any other disposition of the property.

15. The lieutenant-governor Delassus had no power, on the 21st Nov., 1803, to grant the land in controversy to any one, nor has any grant or concession, made after the treaty of cession, ever been recognized by law as any evidence of title or rightful claim. The land was the property of the United States, to be disposed of according to their laws. His order of the 21st November, 1803, and the proceedings of Soulard in 1804, were utterly void.

16. The verbal declaration made by the lieutenant-governor to Mr. Clamorgan in 1802, as recited in Mad. Lachaisse's petition, "that the demand should be made to him through Mr. Soulard," is no evidence of a grant, and the order made by Delassus 21st November, 1803, besides being without authority, is void for uncertainty: what land was granted in 1802 does not appear.

17. There appears to have been no grant, order of survey, or survey, by competent authority, in favor of Mad. Lachaisse. Her claim had not been confirmed by the commissioners, but had been rejected; she had not, nor had any person for her, inhabited, cultivated, or possessed any part of the lot in controversy; therefore, that lot was not rightfully owned or claimed by her on the 13th June, 1812; and, from that date, it was held by the United States, in trust for the inhabitants of St. Louis. It was not reserved by the president for military purposes, but has been, according to law, designated and set apart to the plaintiffs, for the use of schools. Neither the proceedings of the recorder, nor the act of April, 1816, has or can take away the right vested by the act of 1812, nor defeat the appropriation thereof as intended by that act.

The Court of Common Pleas neither admitted incompetent testimony, nor misdirected the jury, nor refused proper instructions; and the verdict being according to law and evidence, the judgment thereon ought to be affirmed.

E. BATES, in behalf of the appellee—The Board of Public Schools—submits the following propositions:—and,

*First:*—In the absence of any older adverse title in an individual, the title of the appellee to the lot in question is a good, legal, and valid title; and that title is evidenced in the acts of Congress, in the acts of our own General Assembly, and in testimony in this record, as follows:—

1. The act of Congress of June 13th, 1812, reserves the vacant lots therein mentioned for the use of schools in the town of St. Louis.— 2 Story's Laws, p. 1257.

2. The act of 26th May, 1824, (supplementary to the above,) sec. 2, requires the surveyor, under the direction of the commissioner of the General Land-office, to survey, designate, and set apart said lots to the town, for the use of schools.— 3 Story's Laws, p. 1972.

3. The act of Jan. 27, 1831, (a further supplement to the act of 1812,) relinquishes, to the town of St. Louis, all right, title, and interest to the lots

reserved for the support of schools, &c., and gives control of them to the Missouri legislature.— 4 Story's Laws, p. 2220.

4. The act of the Mo. Assembly of 13th Feb., 1833, incorporates the board of president and directors of the St. Louis public schools, (the appellees,) and vests the school lands in the corporation.— See acts 1832, 3, pp. 37–9.

5. In pursuance of the acts of Congress (above cited) of 1812 and 1824, and under the direction of the commissioner of the General Land-office, the surveyor of the United States did survey, designate, and set apart the lot in controversy.— See the copy of the commissioner's letter of instructions, and the surveyor's act under it, with the accompanying diagram; see, also, the plat of the survey of the out-boundary of the town—all in evidence.

Under the first division of this cause, I say—

1st: That the act of the surveyor, designating and setting apart this lot for the use of schools, is, of itself, sufficient proof of the appellee's title; and none but the United States can be heard, to object to the want of irregularity and strict legal propriety of the proceeding. An adverse claimant, resting in possession only, cannot dispute the right.— See 6 Mo. Rep., 118, Hunter *vs.* Hemphill.

2d: The act of 1812 makes an appropriation, a dedication to public use, of the waste lots in, adjoining, and belonging to the town of St. Louis; and the acts of 1824 and 1831 are but parts of the same law, designed to perfect the original intent, and accomplish, in practice, the beneficial object of the first act.—2 Story, 1275; 3 *Ibid.*, 1972; 4 *Ibid.*, 2220; 10 Pet. Rep., 662, New Orleans *vs.* United States; Opinion of the Court, p. 710.

The persons interested in the school-lands under these acts of Congress, made constant claim and early attempts to apply the lands to the objects designed. The act of the territorial legislature of 30th Jan., 1817, (Geyer's Digest, 399,) established a board of trustees, with power, among other things, to lease, rent, and dispose of all such lands as had been, or might be, given by Congress for the support of schools in said town, and, in fact, that board acted long, and, as to some of the lands, efficiently, under the power.

3d: The land being thus appropriated and dedicated to public use, the Government could not, if it would, make any other disposition of it. This principle has often been considered of late years, and seems now to be settled.— See the following cases:—10 Pet. Rep., 662, New Orleans *vs.* United States; 12 Pet. Rep., 454, Strother *vs.* Lucas; Chotard et al. *vs.* Pope et al., 6 Cond. Rep., 655; 12 Wheat., 586; Cincinnati *vs.* White, 6 Pet. Rep., 431; Barclay et al. *vs.* Howell, 6 Pet., 498; 1 Pet. Rep., 94, Hickie et al. *vs.* Stuke; 3 Mart. Rep., 296–303; 4 Mart. Rep., 625.

4th: Before the act of Congress of 1831, the Government was but a trust-holder of these lots, and could no more have conveyed them to a stranger, than any other trustee could destroy the right of his *cestui que trust.* But the act of 1831 relinquished the technical title, and the charter vested it in the plaintiffs.

5th: If it be objected, that this piece of ground is not a lot, I answer, that a lot may be of any shape or size. Every separate piece of land is a lot.

The word lot, as used in the first and second sections of the act of 1812, may well admit of different interpretations. The first section confirms lots to individuals, and such lands only as were inhabited, cultivated, or possessed, and therefore necessarily known in size, shape, and boundary; but the second section disposes of the residuum—the vacant lots not inhabited, nor designated, and therefore not known.—See 5 Mo. Rep., 241, Lawless *vs.* Newman; 6 Mo. Reports, Newman *vs.* Lawless.

6th: The lots disposed of were lots in, adjoining, and belonging to the town of St. Louis; meaning, not the Spanish town of 1803 and before, but the American town of 1812. The former had no survey, and no designated boundary; the latter was incorporated under a territorial law in 1809, and at the passage of the act of 1812 had known and established boundaries, as appears in this record.

For a description of what is a Spanish provincial town, see White's Compilation, in U. S. Land Laws, vol. ii., Appendix I., p. 36; and see the extracts of Spanish law, cited and approved by the court, in New Orleans *vs.* United States, 10 Pet. Rep., p. 724–6.

*Second:*—The adverse claim of Mad. Lachaisse, set up by the defendant, Hammond, in bar of the plaintiff's title, as the same appears in this record, is not any legal or valid title, as to this plaintiff, because—

1. The act of 1812 does not, of its own vigor, confirm the lot to Madame Lachaisse, for the plain reason that she never did inhabit, cultivate, or possess the lot prior to the 20th December, 1803, as appears in this record.

2. The recorder of land titles had no power to adjudge and confirm the claim under the act of 1812; nor could he, under that act, select the claim for confirmation.—See the act minutely, 2 Story's Laws, 1257; Vasseur *vs.* Benton, 1 Mo. Rep., 299, 300.

3. As far as the claim of Mad. Lachaisse depends upon a grant, and the confirmation thereof, the same is null and void; because,

1st: Governor Delassus, on the 21st Nov., 1803, after the treaty of cession, had no power to make the order of that date, to deliver possession to Madame Lachaisse, and the surveyor's act, under it, is utterly void. (6 Cond. Rep., 628, (12 Wheat., 530,) Henderson *vs.* Poindexter's Lessee.) The Spanish government could not make a valid grant in Florida while it had wrongful possession of the country.

2d: The order of possession does not purport to be a grant, and if it did, is void for uncertainty.

3d: Her lot has never yet been surveyed, hence a confirmation would be void for uncertainty.

4th: If confirmed at all, the confirmation must be under an act, after the accruing of the title.—See, again, the act of 1812, and the proceedings of the recorder for the confirmation of the lot to Mad. Lachaisse.

5th: The act of 1816, confirmatory of the report of the recorders of land titles, does not confirm this claim, because the claim is not sufficiently legal and specific

to be capable of confirmation; and because Congress had no power to confirm it to our prejudice.—Act 29th April, 1816, sec. 2; 3 Story's Laws, p. 1604.

*Note.*—The idea of granting the vacant grounds about the towns and villages, as done by the second section of the act of 1812, was first suggested by Thomas F. Reddick, clerk of the old board of commissioners, in a letter addressed to Mr. Morrow, chairman of the Committee of Public Lands in the House of Representatives, dated 26th March, 1812, at Washington, which contained a classification of claims, and suggests the giving of the remnant about the villages for the use of schools.—See Gale & Seaton's Public Documents, vol. ii., p. 450, 1.

Scott, *Judge, delivered the opinion of the Court.*

Congress, by the act of 13th June, 1812, confirmed to the inhabitants of the town of St. Louis severally, their rights, titles, claims to town lots, out-lots, common-field lots, and commons, in, adjoining, or belonging to the said town, which had been inhabited, cultivated, or possessed prior to the 20th of December, 1803. By the second section of the same act, all town lots, out-lots, or common-field lots included in the survey of the said town, directed to be made by the said act, which are not rightfully owned or claimed by any private individual, or held as commons belonging to said town, except such as may be reserved for military purposes, are reserved for the support of schools in said town.

Margarette Lachaisse claimed a lot in the town; the claim to this lot was presented to the first board of commissioners for confirmation, and was by them rejected. The recorder of land titles afterwards, under the provisions of the act above mentioned, reported the said lot for confirmation; and, by the act of Congress of the 29th April, 1816, the claim to the lot was confirmed.

By the act of 26th May, 1824, the individual owners, or claimants, of town lots belonging to St. Louis were, within eighteen months from the passage of the act, required to designate their lots, by proving, before the recorder of land titles, the fact of inhabitation, cultivation, or possession, and the boundaries and extent of each claim, so as to enable the surveyor-general to distinguish the private from the vacant lots appertaining to the said town. By the second section of the same act, it is directed, that immediately after the expiration of the said term allowed for proving such facts, it shall be the duty of the surveyor-general, under the instruction of the commissioner of the general land-office, to survey, designate, and set apart to the said town, so many of the vacant town-lots, out-lots, or common-field lots, for the support of schools in said town, as shall not have been reserved for military purposes.

By the act of January 27th, 1831, sec. 2, the United States relinquished all their right, title, and interest in and to the town lots, out-lots, and common-field lots reserved for the support of schools in the said town, by the second section of the act of June, 1812, above referred to, and directed that the same shall be sold, or disposed of, or regulated, for the said purposes, in such manner as may be prescribed by the legislature of the State of Missouri.

The general assembly of this State, by the act of 13th February, 1833, incorporated the inhabitants of St. Louis by the name and style of " Board of the President and Directors of the St. Louis Public Schools;" and by the ninth section of the same act, authorizes the said board to take possession, charge, and control of the lots granted by the United States for school purposes; and as far as the general assembly could control the title to the said lots, it was vested in the said corporation.

Under instructions from the commissioner of the General Land-office, dated 15th January, 1839, the surveyor-general did survey, designate, and set apart to the said board, the lot in the declaration mentioned.

The plaintiff, in this action, is the corporate body above mentioned, created by the general assembly of this State.

The defendant claimed under the representatives of J. Mullanphy, deceased, who claimed under Margaret Lachaisse, above named. Judgment was rendered against the defendant.

It was contended for the plaintiff, that there had been no grant, order of survey, or survey, by competent authority, in favor of Madame Lachaisse; her claim had not been confirmed by the commissioners, but had been rejected; she had not, nor had any person for her, inhabited, cultivated, or possessed any part of the lot in controversy; therefore, that lot was not rightfully owned or claimed by her on the 13th of June, 1812; and from that date it was held by the United States, in trust for the inhabitants of St. Louis. It was not reserved by the president of the United States for military purposes, but has been, according to law, designated and set apart to the plaintiffs, for the use of schools. Neither the proceedings of the recorder, nor the act of Congress of April, 1816, has or can take away the rights vested by the act of 1812, nor defeat the appropriation thereof as intended by that act.

This is an action of ejectment, and in order to determine the cause, it will be necessary to ascertain in whom the legal title rests.

It is a point conceded on all hands, that the first section of the act of 13th June, 1812, gave to the inhabitants of St. Louis, who had inhabited, cultivated, or possessed a lot prior to the 20th of December, 1803, a legal title, by which they could defend themselves against all claimants. (*Vasseur vs.* Benton, 1 Mo. Rep.; Strother *vs.* Lucas, 10 Peters.) Does the second section of that act vest as absolutely the vacant lots in the inhabitants, in their corporate capacity, as the first section does the title to the inhabitants individually?

The second section enacts, that all lots not rightfully owned or claimed by any private individual, or held as commons belonging to the town of St. Louis, or that the president may not think proper to reserve for military purposes, shall be, and the same are hereby, reserved for the support of schools in said town. These words do not convey title, but merely express the intention of Congress with regard to the vacant lots; it is a declaration of intention, which good faith required should be carried into effect. The donation was not complete; something further was contemplated before the title passed from the United States.

The words of the second section do not pass title to the inhabitants, they merely

10

reserve the vacant lots for the use of the schools in the said town.   If the general government had held the lots thus reserved, and had become the trustee, and employed itself in that capacity, in the management of them for the use of the inhabitants, its undertaking would have been complied with;. it would have discharged the obligation it incurred by the enactment of the second section of the act of 1812.   If one conveys a lot to A., and declares, in the act of conveyance, that he reserves another lot for the use of B., would this declaration divest the grantor of the legal title to the lot declared to be reserved? and could B., on this declaration, maintain an action of ejectment against him ?

The act of March 3d, 1811, authorizing the president to offer for sale the public lands in this State, reserved section numbered sixteen, in very much the same language as is employed in the second section of the act of 1812; the words being—"Shall be reserved in each township, for the support of schools within the same."   Yet these words of reservation were not construed by Congress so to divest the legal title to those sections, as to prevent its passing by a subsequent act, as we find by the act of 3d March, 1819, Congress expressly granting away the sixteenth sections to claimants of pre-emptions, under the fifth section of the act of 12th April, 1814, entitled, "An act for the final adjustment of land titles in the State of Louisiana and territory of Missouri."   In the 5th volume American State Papers, " Public Lands," we find a report from the committee of private land claims, made on the 22d December, 1828, by the representative in Congress from this State, a gentleman by no means unknown, and whose opinions, on any subject, are entitled to respect, urging the passage of a law of Congress, vesting in the board of trustees, for the regulation of schools in the town of St. Louis, incorporated by an act of the general assembly of the territory of Missouri, of the 30th January, 1817, the absolute title of all the lots reserved by the act of Congress of the 13th June, 1812, for the support of schools in the town of St. Louis.   This report, it appears, was induced by a memorial of the said board, in which they declare their inability to effect the purposes for which they were incorporated, "*because the titles to the lots still remained in the United States.*"

This opinion of the board was concurred in by the committee of private land claims, who made the report, which was accompanied by a bill, which we may suppose was afterwards matured into the act of 27th January, 1831, above-cited, and which granted the prayer of the memorialists.

So, the question is, in whom was the fee in April, 1806? in the United States: it passed, by the act of confirmation, to Mad. Lachaisse, and she, or those who claim under her, must prevail in this action, for the legal title alone is regarded in ejectment.   It was said, we are not to construe acts of the legislature so as to make the United States guilty of a breach of faith; but there is here no room for construction.   The first great rule of interpretation is, that we are not permitted to interpret that which has no need of interpretation.   The language of the act of confirmation is plain; the lot in controversy was confirmed without any doubt, ambiguity or uncertainty.

It would be a source of regret, could any thing that has been said be made to bear the construction, that Congress, in confirming the claim of Madame Lachaisse,

was guilty of a breach of faith to the inhabitants of St. Louis. Such an opinion is not entertained. Even had the recorder of land titles erroneously reported for confirmation the lot in dispute, it would not follow, that the United States was guilty of a breach of faith in confirming it. In order to ascertain the sense of Congress on this subject, we must take in consideration, in connexion with the second section of the act of 13th June, 1812, as well the subsequent sections of said act, as the before-cited acts of 1824 and 1831. From these it appears, that the United States reserved the right of ascertaining what lots were rightfully claimed by individuals.

Judge Baldwin, in delivering the opinion of the Supreme Court of the United States, in the case of Strother *vs.* Lucas, 10 Peters, 455, observes, "that, by the second section of the act of June, 1813, all town, out, and common-field lots included in the survey therein directed, not rightfully owned or claimed by any individual, or held as commons belonging to the towns or villages, or reserved by the president for military purposes, were reserved to the towns and villages for the support of schools. In order to ascertain what lots were owned or claimed by individuals, the recorder was, by the eighth section, empowered to act on claims filed before the 1st December, 1813, as has been seen, and those before filed and undecided.

From this language of the Supreme Court, it would seem, that in the act by which the reservation was made, under which the plaintiff claims, the United States retained the power of prescribing a mode of determining who rightfully claimed a lot. Congress acted on the principle, *cujus est dare, ejus est disponere.* If they could grant, they could prescribe terms to the grant. The act of 1824 clearly shows the opinion Congress entertained on the subject of this reservation. By that act private lot holders were required, within a limited time, to make proof of their inhabitation, cultivation, or possession, prior to the 20th December, 1803, so that the vacant, or school lots, might be designated and set apart. This act is not repugnant to, nor inconsistent with the act of 1812, for, according to the opinion of the Supreme Court, the inhabitants took the lots subject to the power here exercised. We have seen the legal title to the school lots was in the United States until the year 1831. Some legislation was necessary to prescribe a mode by which those lots could be separated and distinguished from those which belonged to individuals. If the United States have prescribed a mode of determining the private from the unappropriated lots, and the officer appointed to discharge this duty has reported a lot for confirmation, and the United States have thereupon passed the legal title to the claimant, with what propriety can it be said the public faith is violated? A possibility of committing errors was incident to the right reserved for ascertaining the school lots, and if they were taken with this burden, the plaintiff cannot now justly complain that an error has been committed to its prejudice.

TOMPKINS, *Judge.*—This is an action of ejectment, commenced by the Board of the President and Directors of the St. Louis Public Schools against John Hammond, and judgment being given against him, he appealed to this Court. The matter in

dispute is a lot in the present city of St. Louis, claimed by each party, under the act of Congress of 13th of June, 1812.

On the trial of the cause, the plaintiff gave in evidence a transcript of the record of the Court of Common Pleas of St. Louis county, in the territory, now State, of Missouri; by which it appears, that in the month of November, in the year 1809, the town, now city, of St. Louis was incorporated, with certain limits therein set out. The charter of the city of St. Louis, by a legislative act of 1833, was also given in evidence.

The plaintiff then gave in evidence, a plot and survey of the land described in the declaration, purporting to be a designation and setting apart of the same for the use of schools; this paper is in these words, viz.:—

"Office of the Surveyor of Public Lands in the States of Illinois and Missouri, 28th February, 1840.

"Under the instructions of the commissioner of the general land-office, the piece of land which is herein plotted and described has been legally surveyed; and under the instructions aforesaid, it is hereby designated and set apart to the town, now the city, of St. Louis for the support of schools, in conformity with the second section of the act of Congress, approved the 26th of May, 1824, entitled, 'An act supplementary to an act passed the 13th of June, 1812, entitled, An act making further provisions for settling the claims to land in the territory of Missouri.' The said piece of land, hereby designated and set apart, as aforesaid, is situated within the bounds of the survey so as to include the town lots, out-lots, common-field lots, and commons, of the town of St. Louis, as it stood incorporated on the 13th day of June, 1812, and does not, together with all the other land designated and set apart to the town of St. Louis for the support of schools, under the aforesaid second section of the act of Congress of the 26th May, 1824, amount to one-twentieth part of the whole lands inclosed in the general survey directed to be made of the said town of St. Louis, by the aforesaid first section of the act of 13th June, 1812, nor was it held as commons belonging to said town of St. Louis, nor has it been reserved by the president of the United States for military purposes."

The plaintiff also gave in evidence, a letter of the commissioner of the general land-office to the surveyor of Illinois and Missouri, directing him to set apart certain lands, for the support of schools, under the said acts of Congress, in which lands, so set apart, the land in controversy is included. To the admission of all this evidence the defendant objected, and excepted to the opinion of the Court overruling that objection.

The plaintiff here closed his evidence.

The defendant then gave in evidence, documentary testimony, as follows, viz.: 1st: Notice to the recorder of the claim of Mad. Lachaisse, which he sets up as a defence against the claim of the plaintiff. 2d: Selection of this lot by Frederick Bates, recorder of land titles, for confirmation. 3d: The opinion of said recorder, that the claim of Mad. Lachaisse ought to be confirmed.

An abstract from the books of the recorder was given in evidence, of which the following is the substance, viz.:—That the warrant, or order of survey, was

made by Delassus, the lieutenant-governor: No survey made, the surveyor returning, that he made none, because he did not know whether a street ought to be traced out in that part of the town, and, if so, in whose land the street ought to be traced; and therefore, he had put the lady, widow Lachaisse, in possession of the land lying between the claims of Clamorgan on the north, and Lecompte on the south: the location is described as a lot in the town of St .Louis, of which the applicant had possession prior to 1803. The recorder's opinion was, that the claim ought to be confirmed. Other evidence, both documentary and oral, was given, of which I shall not now take any notice.

The plaintiff then asked these instructions:

1. If the jury find, from the evidence, that neither Margarette Lachaisse, nor any other person for her, did inhabit, cultivate, or possess the lot of ground in controversy, or some part thereof, prior to the 20th of December, 1803, the claim of the said Margarette Lachaisse, as the same is in evidence, cannot avail the defendant as a bar to this suit.

2. The acts, decisions, and reports of the recorder of land titles are not, nor is either of them, evidence, in this action, that the lot, or parcel of ground, included in the survey No. 3,197, or any part thereof, was inhabited, cultivated, or possessed by Margarette Lachaisse, or any person for her, prior to the 20th December, 1803.

The defendant opposed the giving of these instructions, and the court overruling his objections, the defendant excepted to the opinion of the court.

The defendant then prayed several instructions.

1. If the jury believe, from the evidence, that the piece of ground sued for in this action is embraced in the confirmation of the recorder of land titles to Margarette Lachaisse, given in evdence by the defendant, they are bound to find for the defendant.

The second and third instructions amount to the same thing, expressed in other words. It is, in the second instruction, further remarked, that these confirmations of the recorder were made under the act of 13th June, 1812; consequently, though they are, in common parlance, called confirmations, yet they are only recommendations of lots to Congress for confirmation.

The fourth instruction prayed by the defendant is, that, "if the jury believe that no portion of the piece of ground in question was either a town lot or village lot, out-lot, or common-field lot, before the transfer of Louisiana to the United States, then they are bound to find for the defendant.

These instructions the court refused to give, and the defendant, by his counsel, excepted to the opinion of the court.

The jury being thus instructed, found a verdict against the defendant, and he moved the court for a new trial. The court overruled the motion, and the defendant appealed to this Court.

As part of the evidence of the case, it will be here observed, that the act of 29th April, 1816, confirms this claim of Margarette Lachaisse, amongst many others recommended, for that purpose, by the late recorder, Bates. "Then," to use the language of Mr. Justice Baldwin, in Strother *vs.* Lucas, 12 Peters, p. 455,

"comes the act of 1831, the first section of which enacted, that the United States do relinquish to the inhabitants of St. Louis, &c., all their right, title, and interest to the town or village lots, out-lots, common-field lots, and commons, in, adjoining, or belonging to the towns and villages confirmed to them respectively by the act of 1812; to be held by the inhabitants in full property, according to their several rights therein; to be regulated or disposed of for the use of the inhabitants, according to the laws of Missouri."

By the second section of that act, the United States relinquished their right, title, and interest in and to the town and village lots, out-lots, and common-field lots in the State of Missouri, reserved for the support of schools in the respective towns and villages aforesaid, by the second section of the act of Congress of 13th June, 1812, and declared that the same shall be disposed of, or regulated, for the said purposes, in such manner as may be directed by the legislature of said State.

The act of Congress of 13th June, 1812, under which both plaintiffs and defendant claim, is, so far as is material to the present purpose, in these words:—

"Section 1st: The rights, titles, and claims to town or village lots, out-lots, common-field lots, and commons, in, adjoining, and belonging to the several towns or villages of St. Louis, &c., in the territory of Missouri, which lots have been inhabited, cultivated, or possessed prior to the 20th day of December, 1803, shall be, and the same are, hereby confirmed to the respective towns or villages aforesaid, &c."

"2d: All town or village lots, out-lots, or common-field lots included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the president of the United States may not think proper to reserve for military purposes, shall be, and the same are hereby, reserved for the support of schools in the respective towns or villages aforesaid; provided, that the whole quantity contained in the lots reserved for the support of schools in any one town or village shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village.

On the part of the plaintiff below, appellee here, it is contended, that the act of the 13th of June, 1812, "contemplated no further action by the recorder in relation to lots; that whatever lots Congress intended to confirm are confirmed by the first section; and that all not confirmed by that section are reserved, by the second section, for the support of schools." Vasseur *vs.* Benton, 1 Mo. Decisions, p. 300, and Strother *vs.* Lucas, 12 Peters, 454, are relied on as authorities. And it is contended, that if no portion of the piece of ground in controversy was a lot before the 20th of December, 1803, it would follow, that Mad. Lachaisse could have no title to it under the act of 13th June, 1812.— Newman *vs.* Lawless, 6 Mo. Dec., p. 279.

The merits of the case, then, depend on these two points:—1st, What was the duty of the recorder under the act of 13th June, 1812? and, 2d: What is a town or village lot, out-lot, or common-field lot, in the sense in which those words are used in this last-cited act of Congress, viz., the act of 13th June, 1812?

1. In Vasseur *vs.* Benton, this Court said: "According to the construction we give to this act, we are of opinion, that the claims to town and village lots which had been inhabited prior to the 20th December, 1803, are, by the express words thereof, "hereby confirmed," *ipse facto* confirmed, as to the rights of the United States, and which became thereby vested, either in individuals, or reserved for the use of schools therein; that, therefore, the recorder of land titles, (whose power extended no further than to give and report to Congress his opinions on claims to land, in which the United States were only interested,) had no authority to enter into an investigation of, or decide on, the titles of individuals to those town lots, and that any conflicting claims between them to any of those lots ought to be decided in a due course of law, according to their priority of possession, cultivation, or inhabitation.

" A contrary construction would be predicated on the presumption, that Congress had the power, or, at least, that they meant, which we are far from believing, to institute a tribunal to judge of the private rights or claims of individuals; and it would, in effect, be saying, that he had the right of judging of those claims, not only between private individuals, but also between them and the inhabitants at large of the respective towns, &c., to whom, for the use of schools, all lots, &c., not rightfully claimed, had been reserved and given.

"All legislative acts are to be so construed as to endeavor, if possible, to give full effect to every part of them.

" Taking this rule for our guide, we clearly infer, that Congress, by making use of the words, 'shall be, and the same are hereby, confirmed,' intended a full confirmation of the town and village-lots, or they would not, in the third and other sections of the same act, directing the confirmation by the recorder, in certain cases of donation, and other claims to land, have made use of the words, 'shall be confirmed,' in the future tense.

" Hence we conclude, that as far as relates to donation and other claims to land, the recorder was vested with discretionary, but limited, power to judge and give his opinion on the merits of the different claims, as between the United States and individuals, but that he had no such authority as to the town and village lots, they having, by the former part of the act, been confirmed."

I come now to the second authority relied on by the appellees, *viz.*, Strother *vs.* Lucas, 12 Peters, 454.

In order to understand the passage in the opinion of the court here referred to, it becomes necessary to remark, that Strother commenced this suit against Lucas for two of the common-field lots of St. Louis, more commonly called 'forty arpent lots,' (because they are forty arpents deep from east to west, by one arpent in width,) and that these lots had been confirmed to Chouteau by that board of commissioners, to all of whose powers and duties the recorder had, by the eighth section of the above-recited act of 13th June, 1812, succeeded; save only, that he did not confirm, but only gave his opinions in favor of such claims as he thought ought to be confirmed. It will also, for the purpose of well understanding this authority, be necessary to go a little further back than we are referred by Mr. Geyer, *viz.*, to p. 453 of 12 Peters.

The court there says: "The plaintiff gave in evidence two opinions of land titles of St. Louis county, confirming to the representatives of Gamarche and Kiercereau the forty arpent lots of each, and directed each to be surveyed, but did not offer the confirmations to Chouteau by the board of commissioners, which were given in evidence by the defendant."

The plaintiff claims under the former; the defendant under the latter.   That of the plaintiff will be first considered.

By the eighth section of the act of 13th June, 1812, the recorder of land titles was invested with the same powers, and enjoined to perform the same duties as the board of commissioners, (which was then dissolved,) in relation to claims which might have been filed before the 1st of December, 1812, and the claims which have been heretofore filed, but not acted on by the commissioners; except that all his decisions shall be subject to the revision of Congress.

He was directed to report to the commissioner of the General Land-office, a list of all such claims, with the substance of the evidence in support thereof, his opinion, and such remarks·as he may think proper, to be laid before Congress at their next session.   By the act of 1813, the time of filing claims was extended to the 1st January, 1814, under which act the recorder made ·the confirmations relied on by the plaintiff, on the 1st of November, 1815, which was confirmed by the second section of the act of 1816.   But these confirmations cannot avail the plaintiff as a claimant under these or any other acts of Congress, for the following reasons: 1st, that the authority of the recorder of land titles was, by the express terms of the acts of 1812 and 1813, confined to those claims on which the board of commissioners had not previously acted; from which it follows, that after the board of commissioners had made a confirmation of a specific claim, the action of the recorder is either merely cumulative, and so inoperative, or if adverse, merely void, as an assumption of power in a case in which he had not jurisdiction, and his action must be a mere nullity."

These last words, "and his actions a mere·nullity," are, it seems, what Mr. Geyer relies on, and if they be detached from the foregoing and following passages, they certainly are conclusive for him.   But let us pursue the case in Mr. Justice B.'s own words:

"Here the commissioners had decided on the identical claims in 1809, '10: Congress had made a general confirmation of all the claims of the then inhabitants of the town of St. Louis, of their title to the common-field lots in 1812, when the defendant was an inhabitant thereof, and in actual possession of those in controversy; and by the act it was provided, that it should not affect any confirmed claims to the same lands.   Surveys were directed to be made; plots to be made out, and transmitted to the General Land-office and recorder of land titles.   As the act directed no further steps to be taken, the title became complete, and the recorder thenceforth ceased to have any power over the confirmed lots, save to perform the ministerial offices directed by law, as the ordinary duties of his office."

It is most obvious, that Mr. Justice Baldwin has been all along speaking of the action of the recorder on the lots confirmed by the board of commissioners. He calls the recorder's action on those lots, "An assumption and usurpation of

power in a case in which he had not jurisdiction;" and declares, that his action, "when adverse," must be a mere nullity.

Accordingly, in the next page, viz., p. 455, he says: "By the second section, (of this act of 13th of June, 1812,) all town, out, and common-field lots, included in the surveys therein directed, not rightfully owned or claimed by any individual, or held in common, belonging to the towns or villages, or reserved by the president for military purposes, were reserved to the towns or villages for the support of schools. In order to ascertain what lots were owned or claimed by individuals, the recorder was, by the eighth section, empowered to act on claims filed before the 1st of December, 1813, as has been seen, and on those before filed and undecided. The time for presenting such claims was further enlarged by the act of April 1st, 1814."

From both of these extracts of the opinion of the Supreme Court of the United States, as delivered by Judge Baldwin, it seems that the court did not believe, as the Supreme Court of this State decided in the case of Vasseur *vs.* Benton, that the powers of the recorder extended no further than to give and report to Congress his opinions on the claims to land in which the United States were only interested.

I suppose the judge who wrote that opinion intended to qualify the word "which" by the word "only." If that were his intention, the words should have been arranged thus: "on claims to land in which only the United States were interested."

If such be the meaning intended to be expressed in that sentence, (and I can perceive no other that can be consistently given,) the judge and the court could not have recollected, that, by an express provision in the second section of the act of 13th June, 1812, under which act Vasseur claimed, and under which the appellees in this cause claim, the president of the United States might reserve, for military purposes, such lots as were not rightfully owned and claimed by any private individuals, &c. If we even admit, that the Congress of the United States was willing to leave the private individuals to be harassed in the courts of the territory, or future State, by the Corporation of St. Louis; it cannot reasonably be supposed that they could intend that the president of the United States should be compelled to go into the courts of law to ascertain what lots he might, under that act, reserve for military purposes.

It is very true, that Congress has the right and power to subject their agent to this inconvenience, and also to lay the inhabitants of St. Louis at the feet of this corporation, if they had chosen so to do. But they have not expressly said so; and it is by inference only that the Supreme Court of this State have come to their construction of the act of Congress.

For, says the judge, 1st vol. Mo. Decisions, p. 300, when the act speaks of town lots, the language is, that the claims to town lots which have been inhabited, cultivated, or possessed, prior to the 20th December, are, by the express words thereof, "hereby confirmed," *ipso facto* confirmed, and that conflicting claims between the inhabitants to any of those lots ought to be decided in a due course of law, &c.

Again, on the same page, he says, "We clearly infer, that Congress, by making

11

use of the words, 'shall be, and the same are hereby, confirmed,' intended a full confirmation of the town and village lots, or they would not, in the third and other sections of the same act, directing the confirmation by the recorder in certain cases of donation, and other claims to land, have made use of the words, 'shall be confirmed,' in the future tense."

Verbal criticism has its use even in the construction of statutes. It seems to me, however, that the difference in the terms used in the several sections of the act above pointed out may be very easily accounted for, without giving to that act the inconvenient construction contended for by the appellee, on the authority of the case of Vasseur *vs.* Benton.

When, in the first section of the act of the 13th June, 1812, it is said, that the rights, titles, and claims to town or village lots, &c., which lots have been inhabited, cultivated, or possessed, prior to the 20th December, 1803, "shall be, and the same are hereby, confirmed" to the inhabitants, &c., the act unconditionally and absolutely separates this property from the public domain which is afterwards to be brought into market and sold, for the use of the treasury of the United States: and the second section of the same act disposes of such part thereof as should not rightfully belong to any of the inhabitants, or other persons.

But the third section declares, that certain claims to a donation of lands therein specified "shall be confirmed," on condition, and the condition is this, viz.: "In case it shall appear that the tract so claimed was inhabited or cultivated by the claimant, or some one for his use, prior to the 20th December, 1803," &c.

Again, the seventh section provides, that those persons who had not then filed their claims, might do so till the first day of December then next.

If these persons failed to file their claims, the claims, consequently, could not be confirmed; the land, of necessity, must fall undistinguished into the general mass, and with that mass be sold by the United States, whereas the town or village lot, &c., was a thing that, in legal contemplation, had an existence, and was capable of being separated from the general mass of the public lands. In this manner, it seems to me, one may very readily and properly account for the difference between the language used by Congress in the first section, where town lots are spoken of, and that used when claims to a donation of lands are spoken of in the third section, without throwing the claims of the parties into the courts of the country, whether territory or State, to be decided by a due course of law, according to the opinion of the Supreme Court in the case of Vasseur *vs.* Benton, above cited. It may be remarked, that the act of 2d March, 1805, made no special provision to settle the claims of the inhabitants to town or village lots. It provided for the settlement of claims to land only, and the claimants were, by that act, required to file their claims within a given time with the recorder.

Yet many persons filed their claims for town lots, and those claims were acted on, and many of them confirmed by the board of commissioners to settle land claims, as abundantly appears in the State Papers, "Public Lands."

The seventh section, then, of the act of the 13th June, 1812, requiring persons claiming land in the territory of Missouri, and whose claims have not already

been filed, to file their claims within the time therein specified, may, with good reason, be construed to refer to the claimants of town or village lots, &c.

My confidence in the superior abilities and great experience of the judges composing the court when the case of Vasseur *vs.* Benton was decided, long determined me to acquiesce in that decision; and the first time the case of Newman *vs.* Lawless came up, (see 5th vol. Mo. Decisions, p. 338,) I delivered the opinion of the court, recognizing the authority of Vasseur *vs.* Benton. When that case came up the second time, the president of the court was absent, and the appellee being urgent, I very unwillingly agreed to take up the case; but the appellee expressing his determination to take an appeal to the Supreme Court of the United States, in case he were unsuccessful, I the more readily reconciled it to myself to construe the act of Congress as to me seemed best, without considering myself bound by the authority of Vasseur *vs.* Benton. I will here remark, that the case of Newman *vs.* Lawless was argued at the Fall term of 1839, and kept under advisement till the May term, when the judgment was given, and the opinion delivered.

Then came on the case of Gurns *vs.* Administrators of Jarvis, in which the president, being then present, delivered the opinion, and from that I dissented. (See 6th vol. Mo. Decisions, p. 332, May term, 1840.) With so many expressions of the court against me, I should be inclined to surrender my judgment to its authority, were it not that the decision is on a statute of the United States, and the opinion of the Supreme Court of the United States, so far as it is expressed in Strother *vs.* Lucas, seems to me to be favorable to my view of the act of 1812. The recorder, then, I believe, for the reasons above given, had jurisdiction in the case. The recorder has acted on the claim of Margarette Lachaisse, and recommended it for confirmation, and Congress have confirmed it.

In Hoofnagle *vs.* Anderson, (7 Wheaton, 215,) it was decided, Chief Justice Marshall delivering the opinion of the court, that, "If a patent has been issued irregularly, the Government may provide means for repealing it, but no individual has a right to annul it, to consider the land as still vacant, and to appropriate it to himself."

If, then, I am right in my conclusions, as above stated, it is quite immaterial, so far as the appellee is concerned, whether Margarette Lachaisse, or any person for her, did inhabit, cultivate, or possess the lot of ground in controversy, or any part thereof, prior to the 20th day of December, 1803, her claim being recommended by the recorder, in the due and proper discharge of his duties, under the act of 13th June, 1812, for confirmation, and Congress having confirmed it by law, and a confirmation by law being equivalent to a patent.

In my opinion, then, both of the instructions asked by the plaintiff in the Court of Common Pleas were improperly given.

2. What is a town or village lot, out-lot or common-field lot, in the sense in which these words are used in the act of 13th June, 1812? On the part of the appellee, it is said, that any parcel of ground having definite limits, whatever its figure may be, is a lot.

This, in the abstract, is true. If a farmer enclose a piece or parcel of ground, it

is his lot. It may be his grass lot, his horse lot, &c.; and whatever may be its superficies or figure, it is still his lot.

But when words, as often happens in popular language, are susceptible of several meanings, they must be construed according to the subject-matter. Thus, the Supreme Court of Pennsylvania, in the case of Duncan *vs.* Walker, (2 Dallas, 205,) say that the words, "legal representatives must," in legal contemplation, be the heirs, not the administrators, because the subject-matter, in that case, was land, or real estate; and in the case of Mullanphy's Heirs *vs.* Simpson, the late Judge McGirk, delivering the opinion of the court, and referring to the above-mentioned case, of Duncan *vs.* Walker, and admitting its authority, says, that the legal representatives of the deceased must, in legal contemplation, be the executor or administrator, because the subject-matter in the case was personal property or the payment of debts. (See 4th vol. Mo. Decisions, p. 319.) The same principle is recognized in Wear and Hickman *vs.* Bryant, 5th Mo. Rep., p. 164.

In towns or villages, the lots are made by the intersection of streets, generally at right angles. The common-field lots, or, as they are now more commonly called, the forty arpent lots, so called, because they are forty arpents long by one in width, have, at St. Louis, their east end bounded by one general line running nearly north and south. They were laid out with a view to the convenience of the inhabitants, for cultivation. Every court of this State is bound to take notice, that after the transfer of this country to the United States, there was no authority here to lay out the public lands into lots around St. Louis. An out-lot, then, if there be any such thing different from one of these common-field lots, must have had its existence under the Spanish or French governments, and, by the language of the first section of the act of 13th June, 1812, each lot so granted must be in, adjoining, or belonging to St. Louis; and it must have been, like the common-field lot, a constituent part of the town, and not any vacant place or parcel of ground left unappropriated, either accidentally or designedly. To prove that the recorder had no authority to act on the claim of Madame Lachaisse, Mr. Bates, counsel for the plaintiff, appellee, read a letter from the late Thomas F. Riddick, clerk of the above-mentioned board of commissioners, addressed to Mr. Morrow, chairman of the committee on public lands, dated 26th of March, 1812; and Mr. Spalding, counsel for the appellant, to prove the contrary, read a letter from the late Clement B. Penrose, addressed to Mr. Gallatin, then secretary of the treasury. Mr. Penrose was one of the commissioners, and he and Mr. Riddick had borne the report of the board from St. Louis to Washington city: his letter was dated the 20th March, 1812. If there is any thing in either of those letters written before the passage of the law, to indicate an opinion of either of those persons on the law of the recorder's duty, it is too deep for my vision to discover it, and it is very easy to show, by the records of this Court, if it were material, that Mr. Riddick's opinion was different.— See the case of Newman *vs.* Lawless, above cited, in which it appears, that Lawless derived title from Riddick, and that Riddick had purchased the property in dispute from the widow of Marly, according to the appellee's construction of this act of 13th June, 1812. These two letters show, I think, very plainly, how the word "out-lot" came into the

act of 13th June, 1812; for each of these letters was communicated to the House of Representatives, and it is quite a reasonable presumption, that the act of 1812 was passed in consequence of their representations.

Mr. Penrose's letter is as follows:— "Claims for out-lots, or *field lots*, as they are termed, should be confirmed, recorded, or not recorded, if those do not interfere with the claims confirmed: all those tracts have been cultivated from fifteen to fifty years. There may be a few *vacancies*, perhaps, in those fields; grant them, in such case, to the inhabitants, for public schools."

Evidently, he uses the word out lot, and field lot, (meaning, no doubt, the common-field lot,) as words of the same import.

He says, too, that those lots have been cultivated and possessed from fifteen to fifty years. If any out-lots, other than the common-field lots, had been cultivated and possessed from fifteen to fifty years, the appellee could and would have proved it, had it been his interest to do so. But Mr. Penrose says, "There may be vacancies," and recommends what shall be done with them : yet, in the law, nothing is said about giving these vacancies for public schools, and the plaintiff supplies that deficiency in the law, by calling these vacancies, "*out-lots.*"

Mr. Riddick, in his letter, says:—" The forty-ninth class will comprise nearly one-fourth in number of all the claims in the territory, and if confirmed at once by the outlines of a survey to be made by the principal deputy, would give general satisfaction, and save the United States a deal of useless investigation into subjects that are merely matters of individual dispute. The United States can claim no right over the same, except a few solitary village lots, and inconsiderable *vacant spots*, which might be given to the inhabitants for the support of schools."

It is not to be presumed, that men of the high standing and respectability of those letter-writers would rudely obtrude their views on the secretary of the treasury, and the chairman of the committee on public lands; but we must suppose that those high officers, anxious to obtain information from so good a source, solicited their opinions to be given in writing; and, according to Mr. Riddick's opinion, we find the survey directed to be made by the principal deputy. Mr. Penrose's description of the lots is adopted literally in the second section, viz.: "out-lots, or common-field lots;" both terms used as imputing the same meaning; and this is the section under which the appellee claims. It seems to me, that, without any further evidence of the intention of Congress, this section alone ought to be sufficient to restrict the appellee to town or village lots, and common-field lots. But when we reflect on the usual cautious policy of Congress in the disposition of the public lands, and when we consider, more-over, that its attention had been particularly called, by the respective letters of Mr. Penrose and Mr. Riddick, to the existence of this property in and about St. Louis, by the name and description of village lots, out, or field lots; and that the attention of Congress was further called to other property, answering to the description (as these letter-writers thought) neither of village lots, out-lots, nor field lots, which other property Mr. Penrose calls "vacancies," and Mr. Riddick calls "vacant spots;" there is no room left to believe that Congress did intend to

convey any thing by the act of 1812, except what these letter-writers had recommended to be given, under the name of village lots, out, or field lots, and what, consequently, must have actually surveyed and marked out as such lot by the public authorities, before the territory was transferred to the United States.

I, myself, cannot but think, that this is the first time that a piece or parcel of ground left vacant, about a town or village, has ever been called a lot by educated men; and, as the evidence of Mr. Riddick has been introduced here by one of the appellee's counsel, to prove the law of his case, I feel myself at liberty to say, that Mr. Riddick, though no lawyer, (for I knew him as well as the counsel, and much earlier,) understood the English language as well as most of us who pretend to know something of it; and that Mr. Penrose was not only a well-educated man, but spoke the French language well and fluently, and therefore had the best opportunities to acquire information of this kind, among a people who at that time spoke the French language almost exclusively, and but few of whom could understand the English when he first came to the territory, or even in the year 1812.

Both of these persons, then, being well acquainted with the meaning of the language which they used, and also well acquainted with the subject-matter about which they wrote, appear to have expressed themselves deliberately, like men who knew that legislation would take place on the subject-matter of their letters, and that such legislation would probably be influenced by their opinions. There is, then; every reason to believe that they studied accuracy in the terms they used. And Congress, in the grants it made by the act of 1812, seems to have guardedly used, in the law, the same terms used by the letter-writers.

The grant of lots was made according to the recommendation of Mr. Penrose, and the survey of the town directed in the language of Mr. Riddick. But no disposition was made of what Mr. Penrose calls "vacancies," and Mr. Riddick calls "vacant spots."

I was desirous to add the testimony of the late Judge Leduc on this head, as it is a part of the history of the country; but the clerk has not been able to find the record in the case of Newman *vs.* Lawless. It was contained, I think, in the bill of exceptions in that case, and was a part of the testimony, which it was not thought material to set out in the case as reported.

From all I have been able to collect of the practice of the Spanish authorities at St. Louis, as well as from the testimony in this cause, as in others that have been in this court, they never, for many years, did lay out lots, but on the application of persons who demanded them, either for cultivation or residence. If that be the case, it necessarily follows, that there would be no vacant lot about or in St. Louis, unless it were abandoned by the person for whom it had been laid out, or his assignee, as in the case of Chancellor's widow, who, after the death of her husband, removed to St. Charles. (Strother *vs.* Lucas, 12 Peters.) The power of granting land confided by France to the governor of the province, was, after the transfer, continued by Spain in the same officer, till the year 1798, when it was given to the intendant-general. (See 2d vol. Land Laws, 530–554.) The lieutenant-governor at St. Louis, and other officers in their respective districts, had

authority to grant permissions, under certain regulations, to persons to reside on the lands of the Crown, till they got a title from the governor, first, and after the year 1798, from the intendant; and until the patent emanated from the governor or intendant, the land was not severed from the domain. That government which had provided by express law that there should be no title without the patent of the governor or intendant, would not suffer the villagers of the wilds of Louisiana to gain a title from itself, by law of prescription of their own making. Thence the right of the United States succeeding to the rights of the Spanish crown, to require these people to prove their incomplete claims within a given time, the corporation should have attended the recorder's court, and have produced testimony to prove unjust claims. The act of 1812 gave them the property without any dependence on the legislature of Missouri. But Margarette Lachaisse has now obtained a title to her property, which none but the government of the United States can defeat.— Hoofnagle *vs.* Anderson, 7 Wheaton, above referred to.

The letters of Messrs. Penrose and Riddick, above mentioned, are found in the second volume State Papers, by Gales and Seaton, pp. 448 and 451.

It being, in my opinion, the duty of the recorder of land titles, under the act of 1812, to take jurisdiction of claims to town or village lots, &c.; and he having, in the discharge of that duty, recommended the claim of Margarette Lachaisse for confirmation; and Congress having, in pursuance of his recommendation, confirmed that claim, I am therefore of opinion, that the two instructions asked by the plaintiff, from the Court of Common Pleas, ought to have been refused, and that the first instruction asked by the defendant in that case in that court, appellant here, ought to have been given. The appellant's second and third instruction prayed, seeming to me to differ in nothing but mere words from the first, were well enough refused.

It being further my opinion that the words, "out-lots or common-field lots," as they are used in the second section of the act of 13th June, 1812, are synonymous terms, I therefore conclude, that Congress did not intend to give to the town of St. Louis any land except what was known and marked out by survey of the proper officer as a town or common-field lot.

The fourth instruction, then, prayed by the defendant, ought, in my opinion, to have been given. This being my view of the case, it necessarily follows, that in my opinion the evidence of the incorporation of the town of St. Louis in 1809 was irrelevant, and ought to have been rejected. For the same reasons, I believe that the letter of the commissioner of the general land-office, and the evidence of the action of the surveyor of Illinois and Missouri, under his direction contained in that letter, was all irrelevant, except that part which tended to show that the president of the United States retained no part for military purposes, and that the land set apart by him for schools did not amount to more than one-twentieth part of the whole of the lands contained in the general survey of the town directed to be made by the first section of the act of 13th June, 1812.

For the above reasons, the judgment of the Court of Common Pleas ought, in my opinion, to be reversed: it is accordingly reversed and remanded.