### IN THE

# SUPREME COURT

### OF THE

## STATE OF MISSOURI,

### OCTOBER TERM, 1852, AT ST. LOUIS.

~~~~~~~~~~~~~~~~~~~~

KISSELL, Plaintiff in Error, *vs.* THE BOARD OF PRESIDENT AND DIRECTORS OF THE ST. LOUIS PUBLIC SCHOOLS, Defendants in Error.*

1. The survey, designation and setting apart, for the support of schools, of a piece of property, described to be within the out boundary of the town, as directed to be surveyed under the act of June 13, 1812, taken together with the act of 1831, make a regular, formal title to the property so set apart.
2. An entry of the same land with the register and receiver must yield, in an action of ejectment, to the title under such designation.
3. If the purchaser, under such an entry, is allowed to question the legality of the act of setting the property apart for the support of schools, he must show it to be entirely without authority of law, and void, in order to have benefit from such impeachment of title.
4. A designation, which describes the land set apart for schools, as "within the bounds of the survey directed to be made by the first section of the act of June 13, 1812," &c., and as "within the limits of the town of St. Louis, as it stood incorporated on the 13th June, 1812," &c., is not invalid on its face, although it does not state that the land thus set apart ever was, in whole or in part, a town lot, out-lot or common field lot, belonging to the town, or that it was set apart as such.
5. The fact that the survey of the out boundary of St. Louis, under the act of 1812, professes to be a survey of the *incorporated* town, with the out-lots, common field lots

*Eberle v. *Schools* and *Lane's Executors* v. *Schools*. RYLAND, Judge. These cases, coming within the principles decided in the case of *Kissell* v. *Schools*, must be governed by the decision in that case. Judgment affirmed.

35—VOL. XVI

and commons, does not invalidate it, when it is manifest that the incorporated town, according to its own limits, must be within the out-boundary required to be run.

6. The fact that the survey of the out-boundary includes too much or too little land, does not invalidate it, as to any property rightly included within it; and to impeach the survey, it must be shown that the land in dispute was not rightly included.

7. The first section of the act of 1812 contemplates a continuous out-boundary of the towns, to be so run as certainly to include the out-lots, common field lots and commons of the towns.

8. It was not necessary, in order that property included within the out boundary should be reserved for the support of schools, that it should have been surveyed into town lots, out-lots or common field lots under the Spanish government.

9. The act of 1812 was designed to dispose of all the property included within the out-boundaries of the towns.

10. Vacant land contiguous to the town of St. Louis, bounded on all sides except one fronting on the river, by land surveyed into lots, might properly have been set apart as an out-lot, according to the practice of the government, though it had never itself been surveyed as a lot.

## Error to St. Louis Circuit Court.

This was an ejectment for a lot south of Mill Creek, in Evans and Langham's addition to the city of St. Louis. On the trial, the plaintiffs below, defendants in error, offered the following documents in evidence : .

1. An order of the St. Louis Court of Common Pleas incorporating the town of St. Louis, dated November 9, 1809, a copy of which may be found in the report of the case of *Eberle* v. *Public Schools*, 11 Mo. Rep. 248.

2. A map marked X, purporting to be a plat and description of the survey of the out-boundary line of the town of St. Louis, in the territory of Missouri, as it stood incorporated on the 13th June, 1812, including the out-lots, common field lots of the common fields of St. Louis, and the commons thereto belonging, made in pursuance of the first section of the act of congress, approved June 13th, 1812, entitled " an act making further provision for settling the claims to land in the territory of Missouri."

3. A survey by the surveyor general, in pursuance of instructions from the commissioner of the general land office, setting apart, for the use of schools in the city of St. Louis, certain land, including the premises in question.

The possession of the defendant was admitted.

At the close of the plaintiffs' case, the defendant asked the following instruction:

"The map marked X and the location and survey do not prove or tend to prove that the premises in question are any part of a field lot, out-lot, or town or village lot, within the meaning of the act of June 13th, 1812, and reserved for the use of schools, within the meaning of the said act and the several acts of congress in relation to said reservations."

This instruction was refused and the defendant duly excepted.

The defendant then introduced the following evidence:

1. Survey of fractional section twenty-six, township forty-five north, range seven, east of fifth principal meridian, dated March 25, 1836; also, a plat of said survey.

2. Certified copy of entry by Robert Duncan, on preëmption allowed of said fractional section, from the office of the register and receiver at St. Louis, dated May 2, 1836.

3. Receipt of the register and receiver for the purchase money.

4. Records and deeds deducing title from Robert Duncan to defendant.

5. An old map, known as Chouteau's map, found in the office of the recorder of land titles, purporting to be made in 1780, and to represent the Spanish town of St. Louis, as fortified by Lieutenant Governor Cruzat. This map was verified by witnesses and represented the south line of fortifications as north of Mill Creek.

6. An ordinance of the trustees of the town of St. Louis, made in 1811, establishing the boundaries of the town, by which Mill Creek is fixed as the southern boundary.

7. Assessment roll of the town for the year 1812, in connection with the testimony of William C. Carr, who was then assessor, showing that the municipal jurisdiction was confined to the boundaries stated in the above ordinance.

8. The following surveys, plats and maps: Maps of Ste. Genevieve and New Bourbon; plat of Village-à-Robert; sur-

vey of Portage des Sioux ; Spanish survey of Chouteau Mill tract ; surveys 316, 317 and 318, vacant land at south end of town of St. Louis, and 314 and 315 ; township map of township 45, range 7 east ; plats of common fields of St. Louis, Grande Prairie and Prairie des Noyers common fields, and field notes of the survey of these common fields.

William H. Cozzens, Robert Simpson, René Paul, Pascal L. Cerré and David Adams, witnesses for defendant, gave evidence showing that the actual southern boundary of the inhabited part of the town, in 1812, and for many years afterwards, was north of Mill Creek, and that, at that time, there were no town or village lots south of the creek. Paul testified that he surveyed the town in 1816 and again in 1823 ; that in 1816, there were no buildings on fractional section 26, but in 1823, there was a brick house next north of Soulard's line. He did not know whether there was any occupation between Soulard's line and the creek, in 1816. Cerré testified that there was some unoccupied land between Soulard's farm and the creek, in 1812, or about that time. Moore stated that, in 1814, there were no buildings or timber south of the creek, until you came to Soulard's farm ; that there was an open space between the farm and creek. Adams stated that there was vacant land between the creek and Soulard's lines, and that there were no inclosures there in 1812. Papin, Ortez, and Vasquez stated substantially the same. It was also shown that the lot in question was not covered by the common fields.

William Milburn testified that he was surveyor general in 1839-40-41, and clerk in the office as far back as 1816, and that he constructed map X, given in evidence by plaintiffs, from previous surveys made under the authority of his predecessors in office ; that Brown made different surveys, under the authority of government, of Prairie des Noyers, Grande Prairie fields, common fields and commons, between 1817 and 1820, all of which were made by retracing lines made under the Spanish government ; that the lines on the map were taken from these surveys, except the line of the commons, taken from

survey of commons in 1832 or '33 ; that the line of the corporation, as marked on map X, was first run in 1820, and the north line thereof was resurveyed, in making the map. Witness stated that there never was any survey of out-lots, *eo nomine ;* but there were surveys of commons, common field lots and village. On cross examination, he stated that map X correctly delineated the out-boundary of the town of St. Louis, including the commons, common fields and out-lots, except that it might have included the Grande Prairie common fields, Prairie des Noyers, some common fields south-west of Grande Prairie, and Cul de Sac common fields. If these had been included, it would not alter the effect of the survey on the parties to this suit.

Plaintiffs, in reply, offered evidence tending to show that the land set apart and claimed was of the description reserved for schools by the act of June 13, 1812. To this defendant objected, for the reason that, if the plaintiffs claimed the land as an out-lot, they should have given the evidence before they rested and not in reply—that it was a new and distinct claim. The objection was overruled and defendant excepted. Plaintiffs then gave in evidence various concessions of lots along the river, north and south of the village of St. Louis, and confirmations of the same, showing that some of them were confirmed by the name of out-lots ; also, map of the subdivision of Shawneetown into in-lots and out-lots, under the act of 1811 ; and maps showing out-lots of St. Louis, St. Charles, Carondelet, St. Ferdinand, New Madrid, Portage des Sioux, and Mine-à-Breton. The letters of instruction to the surveyor general were also offered ; also, a letter from the commissioner of the general land office, directing the entry of Robert Duncan to be cancelled.

Antoine Smith, a witness for defendant, in rejoinder, testified that he never knew the village authorities to exercise any control over the lots south of the village.

The defendant asked the following instructions, all of which were refused :

1. The jury are instructed that the claims of the respective parties to the land in controversy must depend, mainly, upon the question, whether it was reserved for the schools by the act of congress of 13th June, 1812. If not reserved for the schools, it was land liable, or which might be the subject of preëmption, and the decision of the register and receiver of the land office at the period when this claim was allowed, is final and conclusive.

2. If not reserved for the use of schools, the certificate, showing payment, and the survey and the subsequent conveyances under which defendant claims, are sufficient evidences of title to protect the possession of the defendant, and to enable m   to call in question the validity of the proceedings under which the plaintiffs claim.

3. The defendant claiming under a sale by virtue of a judgment in favor of the United States, these proceedings are an admission of title in Langham, under whom defendant claims, of such a right as will enable the defendant to call in question the validity and regularity of the proceedings under which the plaintiffs claim. This and the two preceding instructions require that the jury shall believe the certificates of the register and receiver, and the receipt, the judgment, execution and deeds to Langham, Evans and defendant, were duly executed.

4. In ascertaining whether the land was reserved for the use of schools, the jury will find, from the evidence, first, whether the land in controversy was a village or town lot within the limits of the old Spanish town of St. Louis, as it existed prior to or at the time of the transfer of the country from its former owners to the United States, or any part of such lot; second, if the jury believe it was not such village or town lot, or any part of such village or town lot, they will then find from the evidence, whether it was a common field lot or out-lot belong to the said town or village of St. Louis.

5. In ascertaining whether the land in controversy was a common field lot or out-lot belonging to the old Spanish town of St. Louis, the jury will find, first, whether the land in

controversy was a lot, that is, whether it had been designated as such before the change of government ; second, whether the land in controversy was subject to the regulations of the village authorities as were the common field lots, commons and village lots belonging to said town or village.

6. If the jury shall find that the premises in question were no part of a town or village lot, out-lot, or common field lot, within the rules before laid down, they will find for the defendant.

7. In ascertaining the facts in the case, if the jury shall find that the survey designated map "X," and the setting apart by the surveyor general of the land marked B, have been made upon the assumption that the town, as claimed to be incorporated by the Court of Common Pleas, was the town or village referred to in the act of 13th June, 1812, they will reject such surveys as founded upon erroneous data, and not made according to law : provided, also, they believe the old or Spanish town was altogether different in its exterior lines and boundaries from the said claimed incorporation.

8. If the survey and setting apart the land in controversy shall be found to be of land as within the town or village of St. Louis, and the jury shall find the same is without the town or village, then the survey and setting apart are to be rejected as any evidence of right in the plaintiffs.

9. The jury are instructed that the fact that various distinct parcels of land around St. Louis, have, since the passage of the act of 1812, been called out-lots in the reports of the recorder and in the surveys, is no evidence that the premises in question, or any part thereof, was an out-lot, unless it shall also appear that the premises in question was part of a series of allotments, known and designated as out-lots, belonging to said village before the change of government.

10. The act of congress of 13th June, 1812, did not require a continuous boundary, which should include the town, common fields, out-lots and commons, where either was sepa-

rated from the other by intervening tracts ; in such cases, the act required separate surveys of each.

11. If a continuous boundary is required by the act of 13th June, 1812, then the line should be so run as to make the eastern line of the commons the eastern boundary, so far as that line extends from south to north, and then connect the north-eastern corner of the commons with the old town by a straight line.

12. If the jury find from the evidence, that the land sued for in this action was not a town lot, village lot, or common field lot, at the time the American government took possession of Upper Louisiana, they will find for the defendant.

13. If the jury find from the evidence, that the land embraced in this suit was beyond the limits of the town of St. Louis, as said town existed under the French and Spanish governments, and that on the 13th June, 1812, it was not any part of the land inhabited, used or laid out for the purposes of said town or its inhabitants, they will find for the defendant.

14. If the jury believe from the evidence, that the land in question was, during the French and Spanish governments, outside of the town of St. Louis, and was, as late as 13th June, 1812, an unappropriated and vacant space beyond the regular limits of said town, they will find for the defendant.

15. That the act of congress of 13th June, 1812, entitled " an act making further provisions for settling the claims to land in the territory of Missouri," does not reserve, for the use of schools in towns and villages therein mentioned, any land which had not been made a town or village lot, out-lot or common field lot previously and by proper authority.

16. If the jury find from the evidence, that the survey of the out-boundary line of the town of St. Louis, under the act of 13th June, 1812, could have been run so as to include the out-lots, common field lots and commons thereto belonging, and exclude the land in this action sued for, they will find for the defendant.

17. If the jury find from the evidence, that the land in question, before and on the 13th June, 1812, was a vacant space, not embraced within the streets of St. Louis, nor included among the regular lots of the village, and that it had never been a common field lot, then the said act of congress did not reserve it for the support of schools.

18. That the town or village lots, out-lots and common field lots reserved for the use of schools by the act of 13th June, 1812, and relinquished by the act of 29th January, 1831, to the inhabitants of the several villages therein mentioned, was a reservation to the villages, as they were under the French and Spanish governments, and the act of the legislature incorporating the plaintiffs, to be elected by the inhabitants of the city of St. Louis, as it stood incorporated at the passage of said act, is ineffectual to divest the trust fund from the ancient inhabitants of the village of St. Louis to the modern city of St. Louis, and the authority in the act, authorizing the election of the board of directors by other than the grantees, is null and void, and the plaintiffs cannot maintain this action.

19. The preëmption to Robert Duncan conferred a valid claim under the preëmption laws, and he, having settled on the land before any survey thereof was actually made, is entitled to hold it; and the persons deriving title from said Duncan have a title superior to the plaintiffs.

20. The court is requested to instruct the jury, that the paper offered in evidence by the plaintiffs, marked No. 2, and headed General Land Office, August 1st, 1845, and signed James Shields, commissioner, and addressed to "Register and Receiver, St. Louis, Missouri," does not invalidate or affect the entry of the land in question by Robert Duncan, under the preëmption laws of the United States, and that the same is no evidence in this cause, and is excluded from the consideration of the jury.

21. The survey attempted to be given in evidence by the map marked "X," is not of itself any evidence that the land

in question, or any part thereof, was reserved for the use of schools by the act of congress of 13th June, 1812.

22. The court is requested to instruct the jury that an out-lot and common field lot, as mentioned in the act of congress of 13th June, 1812, mean the same thing.

23. The document, purporting to be an assignment, or set-ting apart of the land in dispute by the surveyor general, for the use of schools, shows no title in the plaintiffs, without other evidence, establishing the fact that the said land belongs to the class reserved by the act of congress of June 13th, 1812.

24. The papers offered in evidence by the plaintiffs, pur-porting to be evidence taken before Recorder Hunt, are no evidence in this case.

25. The copy of the record from the Court of Common Pleas, purporting to erect a corporation, is no evidence of any such corporation, the court not having any jurisdiction to create it.

To this refusal to give the instructions asked, defendant ex-cepted. All instructions asked by plaintiffs were refused, and the court gave the following, to which defendant excepted:

" The court is asked to instruct you, that the claims of the respective parties to the land in controversy must depend main-ly upon the question, whether the land was reserved for the use of schools by the act of 13th June, 1812. In this view, the court concurs; but, without advising you more at large upon that subject, as requested, gives the case the direction indicated by two of the propositions submitted, one on either side, designed to effect a comparison between' the titles of the parties. These are as follows: on the part of the defendant, ' that the preëmption to Robert Duncan conferred a valid claim under the preëmption laws, and that, he having settled upon the land before any survey thereof was actually made, is enti-tled to hold it, and that the persons deriving title from said Duncan have a title superior to the plaintiffs.' On the other hand, it is insisted that ' the title of the plaintiffs, under the act of the surveyor general, designating and setting apart the ground in controversy to the plaintiffs, is superior to the title

of the defendant under an entry with the register and receiver of the land office.' And of this opinion is the court. The jury is therefore instructed that, upon the titles exhibited in testimony by the parties, the plaintiffs are entitled to recover.

" The court adds, that the defendant has the right to impeach the title of the plaintiffs, the same, and to the same extent, as if the entry of Duncan, under which he claims, had not been vacated by the commissioner of the general land office. And the court further instructs the jury, that no evidence has been adduced on the part of the defendant, competent to invalidate or overthrow the plaintiffs' title ; therefore the jury should find for the plaintiffs."

There was a verdict for plaintiffs, and defendant brings the case here by writ of error.

*J. Spalding*, for plaintiff in error.

I. Cancelling the entry by Duncan did not divest his right. 9 Mo. 323. *Wilcox* v. *Jackson*, 13 Pet. 498. 9 Pet. 117. 12 Mo. 12.

II. The instruction given by the court is erroneous : 1. In asserting that no testimony had been given by the defendant, competent to impeach or invalidate the plaintiffs' title. 2. The survey of the out-boundary line, 'and designation for use of schools, do not, as against defendant possessing under a sale from the United States, make a *primâ facie* title. 3. If the survey and designation are presumed correct, so also are the acts of the register and receiver in allowing the pre-emption, and of the surveyor in locating it as a fractional section ; so that there is presumption against presumption, thus leaving the matter *in equilibrio*. *Hammond* v. *Schools*, 8 Mo. 65. *Trotter* v. *Schools*, 9 Mo. 69. ˙*Eberle* v. *Schools*, 11 Mo. 247. Acts of 26th May, 1824, and of 27th January, 1831, supplemental to act of 13th June, 1812. 4. The out-boundary line raises no *primâ facie* case, inasmuch as there is evidence impeaching it, indeed showing positively that it was wrong, in not embracing the Grande Prairie, Prairie des Noyers and Cul de Sac common fields. Like a witness, being discre-

dited in part, its credit is lost. 5. But there is evidence tending to prove that the out-boundary should have been so run, as not to have embraced the piece of land in question. 6. There was evidence tending strongly to prove that the land in controversy never was a village or town lot, common field lot, or out-lot, prior to December 20, 1803, nor even down to, and after the passage of the act of June 13, 1812. 7. But even if the out-boundary line and designation and setting apart make out a *primâ facie* case, still there was some evidence touching the legality of the same, which ought to have been left to the jury. Those acts of the surveyor and commissioner are not conclusive. *Eberle* v. *Schools*, 11 Mo., opinion of Judge Napton at pp. 264 and 266, and of Judge Scott, at p. 261. In 13 Pet. 498, the United States Supreme Court indicates how far reliance is to be placed upon the acts of the public land agents; that their acts are not binding in regard to the fact, *whether the land was public land, or whether it was of the description which would authorize their act appropriating it;* that those facts are open to inquiry in courts of justice, in cases involving the title to the land. 8. The testimony of Cerré, Paul, Cozzens, Simpson and the old map of the town, and other maps shown on the trial, make it appear, with reasonable certainty, that there were no town or out-lots between the Cerré or Soulard plantation, on the south, and the Chouteau Mill tract on the north, and the Mackay tract on the west. There is no evidence from the land records of the country, or oral, tending to show that there ever was a lot in that space. The town, as incorporated in 1809, or as it existed under the American government, is not the town referred to, when the act of congress speaks of town or village lots, out-lots, or common field lots, but the Spanish town. The lots intended by the act were such as were created before the change of government. 11 Mo. 265. The act of June 13th, 1812, shows it in its caption and provisions; and this act is one of a series of acts for the relief and benefit of the people of the newly acquired territory. The words in the first and second sections

are the same. If, therefore, the first *confirmed* only lots existing under the Spanish government, the second *reserved* only such. Vacant, unappropriated spaces were neither confirmed nor reserved by that act. There was no authority to make lots or out-lots or common field lots, after the change of government, until the act of June 13th, 1812, was passed.

The entry of Duncan was regular and gave title, as against the United States ; so that the instruction is not sustained on the ground that the defendant's title was void on its face. In fact the court admits this in its instructions. Acts of congress of May 29th, 1830, April 5th, 1832, July 14th, 1832, and June 19th, 1834. U. S. S. pp. 420, 503, 603. *Pettigrew* v. *Shirley*, 9 Mo. 687.

The effect to be given to the survey of the out-boundary line of St. Louis, being of great importance in these cases of public school property and claims, I subjoin several observations thereon.

1. The act of congress requiring it, gives no effect to it, except to limit and describe the territory within which the "lots" are *granted* or *reserved*, by that act. It does not enact that all the lots within that boundary, are *hereby granted* for the use of schools, and this court, in the case of *Hammond* v. *Public Schools*, 8 Mo. Rep. 65, held that the *reservation* gave no vested rights. 2 U. S. S. 748–49–50, act of congress of 13th June, 1812.

2. The act of May 26th, 1824, 4 U. S. S. 65, provides for making proof of inhabitation and cultivation as to lots of individuals, and size, &c., of the lots, "so as to enable the surveyor general to distinguish the private from the vacant lots," &c. This does not *give title* or make the survey evidence. The second section requires the surveyor then "to *survey*, *designate* and *set apart* to said towns and villages respectively so many of the said vacant town or village lots, out-lots and common field lots for the support of schools," as the President should not have selected for military purposes, and not to exceed one-twentieth of the whole land included in

the general survey of each town, &c. But this section fails to state what effect this should have. It does not enact that it should give title.

3. The act of 27th January, 1831, 4 U. S. S. 435, merely gives to the respective towns the title of the lots *reserved for the use of schools* in the act of 13th June, 1812; but makes no reference to the survey of the out-boundary line, and gives it no effect whatever.

4. So that it appears that there is no statutory provision whatever, expressly or impliedly making this survey a title, or even any *evidence* of title.

5. On what grounds of principle, then, is it *primâ facie* evidence of title? The proprietor of land sells a piece, and makes his deed, and surveys the part sold. This, perhaps, as between him and his grantee, would be *primâ facie* evidence against him, that the survey and location was the piece contained in his deed. It is in the nature of a formal admission on his part. It may be, perhaps, *primâ facie* evidence against any subsequent purchaser from the same grantor, as such purchaser has knowledge of the previous deed and location, and he takes under the same grantor, and only the grantor's rights, and stands in his shoes. But how can such survey be *primâ facie* evidence against a previous purchaser from the same grantor? And especially, if such previous purchaser's claim had been previously surveyed for him by the grantor? When the rights of third persons are concerned, a surveyor cannot affect them by a survey. 9 Mo. Rep. 603.

6. This doctrine of *primâ facie* evidence of title, given to an official survey, seems based upon the assumption, that the *land was of the character required to authorize the survey*, and here lies the whole dispute. Was it a *vacant lot*, or was it a *lot* at all, of any description? If you proceed first and show that it was a *town lot* or *out-lot*, then perhaps the *official survey of it* would be held *primâ facie* evidence of its being a vacant one, though even that I deny.

7. The same law of evidence is to be applied to this class of

cases as to others. If an individual sues for a town lot, it will not suffice to merely show an official survey of a confirmation to the original claimant, and then derivative title to the party, and why not? Because he must show *title*, and after *that* is shown, the official survey of the claim is *primâ facie* evidence of size and location. The survey was not made, nor intended by the law, to be in lieu of all title. So, he who claims under the act of 13th June, 1812, must prove title by proving cultivation or inhabitation, prior to 20th December, 1803; but this is not proved by production of the survey of the lot to him, as confirmed under that act.

8. Now the far greater portion of the *lots* and *out-lots* was *private property*, made so by the first section of the act of 13th June, 1812. The presumption, therefore, as to any given lot, would be, that it was private property, and not one of the *reserved lots*. In making the survey, the officer was not dealing with the public domain.

9. The *title* of the public schools depends upon the same fact as that of individuals; that is, on the fact that it was a *lot* under the Spanish government. The official survey of the lot for an individual does not prove this fact; and how can it prove the same for the public schools, unless you have one set of laws for individuals and another for this corporation.

10. Nor does it make any difference that, in the further proof, the individual has to prove an affirmative fact, *i. e.*, inhabitation or cultivation; and the public schools, in many cases, have to prove, or give *primâ facie* evidence of a negative, to-wit: that the lot never was *inhabited or cultivated*. The one is as easily done as the other, and if it were not, yet the fact, whether a *town lot* or *out-lot* is an affirmative fact, on which both titles depend. *That* fact is necessary to the title of both. Why then make the *survey* prove it in the one case, and not in the other?

11. The truth is, that *survey* is evidence of *boundary* and *location*, but never of *title*; and in principle, it never should be. *Survey* is only the *ascertainment* and *designation* of

*extent*, *size*, *shape* and *boundaries* of something previously existing. It does not itself *create* the thing. A *lot* or *tract of land* exists previously, as such *lot* or *tract*, and the survey is merely the *marking out* its extent, shape and limits; and so far as doing this, there is no objection to holding an official survey to be *primâ facie* evidence of what it purports to be; that is, of the boundaries of a previously existing *lot* or *tract*. But to hold that it goes far beyond this, and establishes the previous existence of such lot or tract, is to give an effect to it not warranted by the law, nor by the nature of such an official act. In the present case, the court below decided that the mere survey and setting apart proved that the land was a *lot* or *out-lot* under the Spanish government; and that, too, when it was a mere *ex parte* act, and when other officers of the government, equally trustworthy, had previously decided officially, that it was not a *lot* or *out-lot*.

12. It should be observed that the titles here do not depend on the *survey*, but on *previous grants—grants* made to *individuals* or to the *public* for the use of schools. So that the *surveys* in question are surveys of *previously existing lots*. Two matters are left to the department: *First*, whether a piece of land was a town *lot*, under the Spanish government; and, *second*, where is its true location, and what its size, shape and boundaries. The survey proper is the ascertainment of the last mentioned points. But it may be said that the department has acted, in *designating* and *setting apart* the lot, through the surveyor. But how can this alter the case? The principle is the same. Because a man, whether surveyor or commissioner, says that the title of this lot is in the schools, when its title, if it be a *lot*, had emanated years before, and when the question, whether it be a *lot*, is undetermined by any previous action of government or any judicial tribunal — that because such an assertion of title is made *ex parte* by the commissioner or surveyor, the claimant in possession is to be turned out, seems advancing to an alarming extent, in giving effect to acts of government officials.

13. Let it be remarked that all the *town lots* and *out-lots* had been disposed of long since, and granted by acts of congress, and, of course, the titles of them all vested in the grantees years before these surveys were made. The lots of individuals were granted to them in 1812, and the full legal title then passed and vested, as the Supreme Court of this state and of the United States have always held. The *lots* not so granted then were granted in 1831, and the legal title of them passed from the United States and vested in the several towns, so that the United States had conveyed away all the town lots and out-lots of St. Louis, before these surveys were made. Nothing existed there but private property; the proprietary interest of the government had ceased. How can the government, after this, authorize an officer to determine whether a particular lot belongs to A. or B. ? The function of the government has ended, and it belongs to the courts to say who has the best title and where the respective boundaries of the lots are. If the government chooses to convey its lands through a section of country by one general act, without previous survey, how does it retain the right to interfere afterwards among the grantees, by its agents or ministerial officers, and prefer the title of one grantee to that of another?

14. See the great injustice of such a doctrine. The surveyor sets apart and surveys for schools a private lot. The owner a year or two ago could have proved his title by living witnesses, that is, he could have proved possession of it prior to 1803. But those witnesses have died. Of course the public schools, their *survey* being *title*, now take the lot. Making their survey *primâ facie* evidence of title, as it is, if you make it *primâ facie* evidence of a *vacant lot*, places it in the power of this corporation to disturb a great many proprietors, and do a vast deal of injustice, and its power in this respect is increasing daily.

15. The fact that the surveyor or commissioner is a sworn officer, doing his official duty, makes no difference. In making those surveys, he was running boundary lines between ad-

36—VOL. XVI.

jacent proprietors, and that too, when the law does not declare that it shall have any effect ; and how can the United States interfere with titles here, which have already emanated to individuals, and by law declare the extent of their rights ?

16. Nor can it be said with truth that, in making the grants, they reserved the right of fixing boundaries thereafter. Their act merely makes it the duty of certain officers to do it ; and it should have been done while the United States were interested ; but it was not done. The government granted away all its interest and ceased to own any estate, and in that grant made no reservation.

*Haight* and *Leslie*, for same.

*R. M. Field*, for defendant in error.

I. The acts of congress of June 13th, 1812, 26th May, 1824, and 27th January, 1831, together with the designation of the land in controversy by the surveyor general, constitute a title in the public schools, conclusive on the United States, equivalent to a patent, and binding on all not having a paramount title at the time of designation.

The title of Kissell is a mere entry, not perfected by a patent ; and is inferior in dignity, and must yield to the title of the public schools. *Bagnell* v. *Broderick*, 13 Pet. 436. *Wilcox* v. *McConnel*, ib. 498. *Mackay* v. *Dillon*, 4 Howard, 421. *Les Bois* v. *Bramell*, ib. 449. *Menard's heirs* v. *Massey*, 8 Howard, 293. *Trotter* v. *Public Schools*, 9 Mo. 69. *O'Hanlon* v. *Perry*, ib. 808. *Eberle* v. *Schools*, 11 Mo. 249. The foregoing cases establish the propositions that an entry is inferior in dignity to a patent, and that a grant by congress is of equal validity with a patent.

The designation by the surveyor general, in pursuance of the act of May 26th, 1824, has precisely the same effect as if the designation had been contained in the body of the act. The defect in the act of 1812 was, that no means were provided for ascertaining the lots reserved. This defect was supplied by the act of 1824, and the duty was delegated to the surveyor general of designating and setting apart the vacant lots.

This duty, when performed, must, from its nature, bind the United States, and all their title in the land designated; and, taken in connction with the act of 1831, is effectual to pass the fee in the very land mentioned in the designation of the surveyor general. Accordingly, in *Les Bois* v. *Bramell*, where the effect of a designation of the St. Louis commons, under the same act of 1824, was considered, the United States Supreme Court decides that, " the laws [of 1812, 1824 and 1831] and the acts done by the United States in pursuance of them, we suppose, made and located the commons title as effectually as a patent could have done." This decision goes to the very point of the present case. See also the language of Judge Catron in *Menard's heirs* v. *Massey*, as to the effect of the survey of a confirmed claim.

The language of those judges who have advanced opinions adverse to the title of the public schools is not materially different from the foregoing, as to the effect of a survey. See opinion of Judge Tompkins in Trotter's case, and of Judge Scott in Eberle's case.

The necessary conclusion from these statements of the effect of a survey is, that the United States and their title are bound by the survey, and consequently the public schools occupy the same position as the United States, in respect to a party standing on a mere entry. The rights of the United States in this respect appear in the above cited case of *Wilcox* v. *McConnel*. The contrary conclusion involves a plain logical absurdity, in this, that the title of Kissell, which is confessedly inferior to that of the United States, becomes superior to that of the public schools, which, in its turn, is admitted to be superior to that of the United States; and practically, there would be no controlling title to the land in dispute, for Kissell would take it from the public schools, the United States from Kissell, and the public schools from the United States.

II. If the designation by the surveyor general were regarded merely as *primâ facie* or presumptive evidence that the land designated was within the grant by congress, still there was no

testimony adduced by the defendant below, competent to over-throw this *primâ facie* title, and the jury was properly instructed to find for the plaintiff. See *Kelly* v. *Jackson*, 5 Pet. Rep. 622. The defendant below introduced much testimony, tending to show that the land in dispute was without the Spanish village, and not a part of the common fields in recent times. Farther than this he did not attempt to go, and, for aught that appeared, the land was an out-lot belonging to St. Louis, and properly assigned to the public schools by the surveyor general.

III. There is ample evidence on the record that the land in controversy was embraced within the out-boundary directed to be run by the act of 1812 ; and that it was properly designated and set apart for the public schools.

*Firstly.* The town mentioned in the act of 1812, must be taken to be the one existing and as it existed at the date of the act.

1. This construction is the natural one.

2. It is altogether more consistent with a convenient practical execution of the law.

3. It is plainly suggested by the proviso to section second of the supplemental act of 1824.

4. It has uniformly been adopted and acted on by the heads of the land department of the government.

Under this construction, the present controversy is at an end ; for it is not questioned that the land in dispute lies within the corporate limits of the St. Louis of 1812.

*Secondly.* But if the act of 1812 be construed, as referring to the town as it existed prior to 1803, the result will still be the same ; for the land was clearly proven to be a part of the Spanish town and its dependencies.

1. It was part of the ancient commons of St. Louis, and continued to be claimed and used as such, till it was severed from the great mass of commons land by the intervening grants. The testimony of all the witnesses contained in the record, concurs in this, that in early days the commons ex-

tended quite round the village, embracing all the lots along the river, and also the land lying between Third street and the common fields. Several ancient deeds and grants will be found in the record, containing recitals and descriptions to the same effect.

2. The claim to this land, as commons, was abandoned as early as 1806, as appears by Mackay's survey, filed with the commissioners. And the land was not confirmed as commons, as is conclusively shown by the official survey of the commons.

3. Lying within the Spanish town, as it existed prior to 1803, the land in dispute was properly embraced within the out-boundary run by the surveyor general; and, being vacant, was properly designated for public schools, on the principle decided by this court in *Trotter* v. *Public Schools*, re-affirmed by a part of the court in *Eberle* v. *Public Schools*, and asserted by Justice Catron in *Mackay* v. *Dillon*.

The court is referred to the case of *Mobile* v. *Esglava*, 16 Pet. 234, in which it was held that a grant of *lots*, by act of congress, was effectual to pass *land* not subdivided into lots. See also to the same point, *Dunn* v. *City Council*, Harp. S. C. Rep. 189.

4. Even taking the term *lot* in the strict and technical sense adopted in the case of *Newman* v. *Lawless*, 6 Mo. Rep., the land in question was a lot; for it had fixed and definite boundaries by the lines of Soulard's, Chouteau's and Mackay's surveys, all of which were run by Spanish authority.

· 5. It was an *out-lot* belonging to St. Louis in point of local situation; for it was in close proximity to the village, carved out of the ancient commons, and the first of a series of lots, the last of which was confirmed as an out-lot, *eo nomine*. The first section of the act of 1812 describes out-lots as "adjoining" the town or village, from which it would seem that, in determining what is an out-lot, local proximity is to be regarded. See the plat of Shawneetown, prepared under the act

of 1811, and showing the contemporaneous construction, by the land department, of the term *out-lot*.

6. But it was an out-lot of Spanish St. Louis, in point of jurisdiction and authority; for it lay along a public road, which was under village control, and was itself subject to the regulations of the village syndics.

*E. Bates,* for same.

1. The United States, as the great proprietor and only law-giver over the subject, can dispose of its lands *to whom it* pleases, acting by what agencies and giving what evidences of title it pleases.

2. As the United States often grants lands to many persons in group, and embraces many classes of claims and interests in one compendious act, its grants of such character ought to be largely and liberally construed, to advance the known objects of the government, and ought not to be restricted by any merely technical rules, which possibly may apply to the contracts of private persons.

3. Assuming these principles, and considering the relations of the people of Louisiana to the United States, I submit that the act of congress of 13th June, 1812, (with its two supplements, of the 26th May, 1824, and 27th January, 1831,) disposed of all the interest and title of the United States, within the Missouri towns mentioned in the act.

4. As to the towns and villages mentioned in the act, they are described only by their names, and it is quite immaterial to the purposes of this suit, whether they did or did not exist in Spanish times. If they did, then they might have had inhabitants capable of enjoying the benefits of the first section of the act—the grant of titles to the possessors of private lots. If they did not, still, the town being in existence at the date of the act, the reservation of unappropriated lots for the support of schools therein, *in the future,* is perfect, without reference to past time.

5. It is a mistake to suppose that a Spanish town means

only a collection of dwelling houses and shops on lots and squares regularly laid out, with streets marked and established. In superficie, that is a very small part of a Spanish town, as known in history and recognized by the United States Supreme Court, in 12 Pet. Rep. 441, *Strother* v. *Lucas.* And see White's Compilation, vol. 2, Appendix I, p. 36. And the act of 1812 itself plainly declares that out-lots, common field lots and commons are *parts of the town*, by directing the out-boundary *of the town* to be so surveyed as to include them.

6. The word *lot* is generic, and no more implies any particular size or shape or defined boundaries, than does the word *tract;* it is not used in contradistinction to *farm*, as adverse counsel suppose in argument. On the contrary, hundreds of the old inhabitants had their *farms* upon the *out-lots and common field lots*.

7. The word *lot*, as used in the first and second sections of the act of 1812, may and ought to be construed differently. Individuals could claim, under the first section, such lots only (whether *in* or *out*-lots) as they had " inhabited, cultivated or possessed," and therefore could prove ; and, by the supplemental act of 1824, they were required to prove the fact of their inhabitation, cultivation or possession of the lot, " together with its extent and boundaries. But the lots reserved for schools, by the second section, were vacant, unclaimed, unsurveyed, unknown in size, shape and boundary ; and for that very reason, reserved by a parental government, for the education of the people. The court' will take notice of the historical fact that there were no surveys of the King's domain in Upper Louisiana. So much as to the construction of the statutes.

We will now consider the acts of the officers under those statutes.

8. The survey of the out-boundary of the town is a public survey, about which no private person has any right to make a

question, because it is not, and does not purport to be a survey of any man's land. It is simply the establishment of a municipal boundary, by authority of the government. It is final and absolute, as to individuals, the land office and the courts. It was not made under executive orders (as other surveys, and especially those made under the supplemental act of 1824 are,) but by command of congress itself, in the terms of the act of 1812, addressed to the surveyor directly, and not through the general land office.

If the court should think the survey wrong, still it has no power to correct it : the court must take it for good, as it is, or reject it altogether, as a nullity. Therefore, although we may think it wrong, in this or that particular, still, as no one is authorized by law to review and amend it, it must stand as it is, till congress shall think fit to direct a change.

That the survey is *primâ facie* evidence, is beyond dispute, having been over and over so determined by this court. See the cases of Hammond, of Trotter and of Eberle.

9. The act of the surveyor, under the direction of the commissioner of the general land office, assigning the particular land to the school board, is a perfect evidence of title, as far as the United States could give title—as good as a patent— and, like a patent, implying the fulfilment of all prerequisites, and dispensing with the proof of any.

It may safely be assumed, as a general truth, that hardly admits of exception, that the last evidence provided by the government, of its grants of lands, must, in its nature, be final and conclusive.

Not conclusive that the government has a right to the thing granted ; but that, having the right, the act done is perfect to convey the right of the government. See 10 Pet. Rep. 731, *New Orleans* v. *United States.*

In most cases of grants of land by the United States, patents are provided for by law. But there are large classes of grants, in which no patents are provided for by law, and none

in fact issued.    Patents are neither required nor issued for the vast number of lots confirmed by the first section of the act of June 13th, 1812.

, GAMBLE, Judge, delivered the opinion of the court.

, The present state of the decisions in this court, upon the questions discussed in this case, seems to require a more minute examination of them than would otherwise be thought necessary.

The reports of previous decisions contain such full extracts from the different acts of congress affecting the titles, that a brief statement of their provisions is all that will now be made.

The first section of the act of June 13th, 1812, (2 Stat. at large, 748,) by its own terms confirms the claims of the inhabitants of the several towns and villages in Missouri " to the town or village lots, out-lots, common field lots and commons, in, adjoining and belonging to the several towns or villages," requiring, however, in order to a confirmation of the lots, that they should have been " inhabited, cultivated or possessed prior to the 20th December, 1803."   In the same section, it is made the duty of the principal deputy surveyor, " to survey or cause to be surveyed and marked, (where the same has not already been done, according to law,) the out-boundary lines of the said several towns and villages, so as to include the out-lots, common field lots and commons thereto respectively belonging."

The second section provides that, " all town or village lots, out-lots or common field lots included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be and the same are, by the act, reserved for the support of schools in the respective towns and villages : provided the whole quantity of land, contained in the lots reserved for schools, shall not exceed one-twentieth

of the whole lands included in the general survey of a town or village."

The first section of the act of the 26th May, 1824, (4 Stat. at large, 65,) makes it the duty of the owners of lots which were confirmed by the act of the 13th June, 1812, to prove, within eighteen months after the passage of the act, before the recorder of land titles, the inhabitation, cultivation, or possession of their lots, and the boundaries and extent of each claim, so as to enable the surveyor general to distinguish the private from the vacant lots appertaining to the said towns and villages.

The second section of this act makes it the duty of the surveyor general, immediately after the expiration of the time allowed for the private owners to prove the inhabitation, cultivation or possession of their lots, to proceed, under the instructions of the commissioner of the general land office, to survey, designate, and set apart to the said towns and villages respectively, so many of the said vacant town or village lots, out-lots and common field lots, for the support of schools in the said towns and villages respectively, as the President shall not, before that time, have reserved for military purposes, and not exceeding one-twentieth of the whole lands included in the general survey of such town or village.

On the 27th January, 1831, an act of congress was passed, for the purpose of transferring the title of the United States to the property belonging to the several towns and villages, which had been acted upon by the act of the 13th June, 1812, 4 Stat. at large, 435. The first section relinquishes to the inhabitants of the several towns and villages, all the right, title and interest of the United States in and to the town or village lots, out-lots, common field lots, and commons confirmed to them by the first section of the act of the 13th June, 1812. The second section relinquishes all the right, title and interest of the United States in and to the town and village lots, out-lots and common field lots, in the state of Missouri, reserved

for the support of schools in the respective towns and villages, by the second section of the act of the 13th June, 1812.

The title paper exhibited by the public schools for the lot now in controversy, is a document issued by the surveyor general for a larger piece of ground assigned to the public schools under the instructions of the commissioner of the general land office, which includes the lot involved in the present suit. The action of these officers of the government professes to be under the different acts of congress before mentioned.

The title of the defendant, Kissell, is under a purchase from the government, made in the name of Robert Duncan, in the year 1835, under the preëmption laws.

The other facts in the cause, which are material to the decision of the questions arising in the case, will be noticed as the questions are considered.

1. The question is presented upon the facts now stated, whether the legal title to the property has passed from the United States, and to whom? In the case of *Hammond* v. *The Public Schools*, 8 Mo. Rep. 65, it was held by this court, that the reservation of property for the use of schools, made by the second section of the act of June, 1812, did not operate to transfer any title from the United States in the property so reserved, and this opinion is approved in the subsequent cases in which these school titles have been considered. In the same opinion, it is intimated that the title of the United States to the property reserved by the second section of the act of 1812, passed by the act of the 27th January, 1831, and this seems to be conceded in all the subsequent cases. In the present case, it is contended for the appellant, Kissell, that the act of 1831 so operates to pass the title, that no document from any public office is required to be issued ; and if one is issued, it is of no further use than to furnish evidence of the subject upon which the act has operated.

It is also insisted, that the act of 1831 supersedes the act of 1824. When we observe the titles of the two acts, we will see that the latter was not designed to supersede the first. The

act of 1824 is entitled " an act supplementary to an act passed on the 13th June, 1812 ;" the act of 1831 is entitled " an act further supplemental to an act entitled, &c., passed the 13th June, 1812." If the provisions of the two are inconsistent, then the latter repeals the former, but only so far as they are inconsistent. If they can stand together, it is obviously the general intent of congress that they should both stand.

The act of 1831, in its first section, is a relinquishment of the right of the United States to the property confirmed by the act of 1812. This was only consummating the title, of which evidence was to be given under the act of 1824 by the certificate of confirmation issued by the recorder, so far at least as property of individuals was confirmed. So far as the commons of the different towns were concerned, the act of 1824 had required the surveyor to survey and designate them, and the act of 1831 was a relinquishment of the title of the United States to them. The act of 1824 had required the survey and designation of the school lots, under the limitations contained in the act of 1812, that is, that they should be vacant, not rightfully claimed by individuals, that they should not be reserved by the President for military purposes, and that they should not exceed one-twentieth of the whole property in the general survey of the town. The act of 1831 was not intended to dispense with this survey and designation, nor with the ascertainment by the officers of the government, of the facts upon which the designation was authorized to be made under the act of 1824.

No reason is perceived for construing the act of 1831, in the clause relating to school lots, differently from those clauses which relate to the commons, and the lots of individuals. If there had been no survey and designation of the commons under the act of 1824, the act of 1831 was not designed to dispense with that requirement of the former act, and leave the towns at large to ascertain and assert their claims to commons as best they might, but was intended to perfect the title of the towns to the commons, surveyed and designated as the former

act required.    The whole difficulty in the construction of these acts, is produced by the fact, that the officers who were required by the first acts to perform certain duties, had not performed them when the last act was passed.   If the property now claimed by the schools had been designated and set apart before 1831, there would be but little difficulty in arriving at the conclusion, that the act of 1831 operated as a relinquishment of the title of the United States to this particular property; but because neither the out-boundary was surveyed, nor the property set apart to the support of schools before that time, it is now contended that the act of 1831 dispenses with all the requirements of previous acts, and throws the title to property claimed for the support of schools open, to be asserted and maintained without any documentary evidence as they may best be able, in courts of justice.    Such is not the design of the act, and the construction given to it in *Boyce* v. *Papin*, 11 Mo. Rep. 16, shows that the act of 1824 is still to be executed by the surveyor, by setting apart the school property, and when it is executed, the act of 1831 operates upon the title.

The act of 1824 was, in part, intended to remedy the evils introduced by the act of 1812, which confirmed titles to property, without any documentary evidence of title existing, by which the property thus confirmed could be distinguished from that which remained public; and it is not to be supposed that congress designed by the act of 1831, either in relation to commons, or the property appropriated to the support of schools, to reproduce the very evils which the act of 1812 had introduced, and the act of 1824 had at least partially cured.

It may then be taken as true, that the designation and the act of 1831, are to be taken together, in considering the effect upon the title.

It cannot be doubted that, under the acts of 1824 and 1831, and a designating and setting apart of property to the schools, by the surveyor general, under the instructions of the commissioner of the general land office, the whole title of the government, legal and equitable, passes.    It is believed that such

would be the effect under the act of 1824, but in order to remove all doubt upon the question, and out of abundant caution, the act of 1831 relinquishes the right, title and interest of the United States. When the document is produced which is required under these acts, the party has produced all that is necessary to show that the title of the government has passed. He need not go back to show the progressive steps in the title. This is a familiar rule, applicable not only to patents, but to inferior evidences of title. All are familiar with the repeatedly declared rule that when a patent is produced, all previous steps required by law before its emanation are presumed. *Polk's Lessee* v. *Wendal,* 9 Cranch, 87. 5 Wheat. 293. *Patterson* v. *Winn,* 11 Wheat. 383. The authority given to the President to direct the sale of the public lands, by the act of March 3d, 1811, is for the sale of such land as " shall have been surveyed in conformity with the 8th section of the act." This is the language of other acts conferring this authority, and yet when a certificate of purchase is produced in our courts, we never expect the party to produce evidence that the survey has been made in conformity with the requirements of the act. Nor do we expect the production of a proclamation made by the President, without which the register and receiver has no authority to sell lands. All such directions of the law are presumed to have been complied with. And when in this case the party produces the designation and setting apart to the use of schools of a particular lot, and the act of 1831, relinquishing the title of the United States, he has shown a legal title to the property, complete in form, and it devolves on the opposing claimant to defend himself, by showing a better title, or that that which is set up against him is void, a mere nullity.

2. The defendant's title in the present case, is one that cannot stand in opposition to that of the schools, if the documentary evidence of the latter be effectual to pass the title of the United States, because a purchaser from the register and receiver, whether he has made the purchase under a preëmption

claim, or by ordinary entry, has no title that can be set up in an action of ejectment against the United States, or the grantee of the United States holding the legal title. *Bagnell* v. *Broderick,*, 13 Peters, 436. *Wilcox* v. *McConnel,* ib. 498.

3. The defendant, then, must rely upon impeaching the plaintiffs' title, by showing it to be void, for if it have in it defects or irregularities only, in the action of the officers, they will not avail the defendant in this action.

It is evident that some confusion may arise in the consideration of the objections made to the plaintiffs' title, from the fact that on the trial in the court below, the plaintiffs gave evidence beyond that which was necessary to the support of their action, and this evidence was objected to by the defendant, and in the view now taken, this evidence must be relied on by the defendant, to impeach the plaintiffs' title.

4. The first objection to the title of the plaintiffs is, that the survey, designation and setting apart of this property for the support of schools, is invalid upon its own face. It is in these words :

" *Office of the Surveyor of Public Lands in the States of Illinois and Missouri :*

" St. Louis, 15th June, 1843.

" Under the instructions of the commissioner of the general land office, the piece of land, the survey of which is herein platted and described, has been legally surveyed, and under the instructions aforesaid, it is hereby designated and set apart to the town (now city) of St. Louis, for the support of schools therein, in conformity with the second section of the act of congress, approved the 26th May, 1824, entitled an act supplementary to an act passed on the 13th day of June, 1812, entitled an act making further provisions for settling the claims to land in the territory of Missouri ; the said piece of land hereby designated and set apart as aforesaid, is situated within the bounds of the survey directed to be made by the first section of the act of the 13th June, 1812, aforesaid, so

as to include the town lots, out-lots, common field lots, and commons of the town of St. Louis, and is also within the limits of the said town of St. Louis, as it stood incorporated on the 13th June, 1812, and does not, together with all other land designated and set apart to the town of St. Lonis, for the support of schools, under the aforesaid second section of the act of congress of the 26th May, 1824, amount to one-twentieth of the whole lands included in the general survey directed to be made of said town of St. Louis, by the aforesaid first section of the act of congress of the 13th June, 1812 ; the said piece of land was not, so far as the records of the office show, rightfully owned or claimed by any private individual on the said 13th day of June, 1812 ; nor was it held as common belonging to the said town of St. Louis ; neither has it been reserved by the President of the United States for military purposes."

Then follows a plat and description of land surveyed.

It is objected, that it does not appear by this document, that the land thus set apart, is, or ever was, in whole or in part, a town lot, out-lot, or common field lot, in, adjoining or belonging to the town of St. Louis, included within the survey of the out-boundary of the town, and reserved by the second section of the act of 1812. It is certainly stated, with great clearness, that "it is included within the bounds of the survey directed to be run by the first section of the act of 1812," as well as within "the limits of the said town of St. Louis, as it stood incorporated on the 13th day of June, 1812." Here is a reference to the boundary of the town, as ascertained under the first section of the act of 1812, and to the boundary run in conformity with the corporate limits, and in whatever way it is ascertained, this ground is said to be within the boundary.

It is next objected, that the document does not show on its own face, whether the property was set apart to the support of schools, as a town lot, out-lot, or common field lot, belonging to the town. This is not admitted to render the act invalid, for when the officers of the government, entrusted to act upon a

particular species of property, give the evidence of their action upon any given piece of property, it will be intended to be within the scope of their authority until the contrary appears.

5. The next objection of the defendant, now plaintiff in error, is founded upon a survey, professing to be a survey of the boundary of the town of St. Louis. The plat and description of this survey, professes to be a plat and description of the "survey of the boundary lines of the town (now city) of St. Louis, in the territory (now state) of Missouri, as it stood incorporated on the 13th June, 1812, including the out-lots, common field lots of the common field of St. Louis, and the commons thereunto belonging, made in pursuance of the first section of the act of congress, approved 13th June, 1812, entitled an act making further provision for settling the claims to land in the territory of Missouri."

The objections to this survey will be considered in the order in which they are presented. First, it is said, that it professes to be based upon the corporate limits of the town as they stood on the 13th June, 1812, and that the act of congress of that date had reference to the limits of the Spanish town as it existed at the change of government, and consequently the survey or plat is erroneous, and could not be the basis of any legal designation of property for the use of schools. When we examine this proposition, it must be with the map before us, that we may see its effect. The survey to be made, is of the out-boundary of the town, so as to include the out-lots, common field lots and commons.

Now it is manifest that if the town, as incorporated, must, according to its own limits, be within the out-boundary required to be run by the act of 1812, then the reference in the survey (which includes the lots and commons) to the act of incorporation, does not, in any degree, affect the correctness of the out-boundary actually run. Suppose the incorporation, instead of extending over a considerable territory, had been confined to the actually inhabited part of the town, and that the survey of the out-boundary, including the lots and com-

mons, had, in such case, referred to the town as incorporated; when it appeared by the survey that the same space thus incorporated would, of course, be included in the general survey, can it be doubted that the survey would be held valid, notwithstanding such reference to the act of incorporation. The mere reference to the incorporation does not, of itself, show that the survey and plat are erroneous.

But it is objected, that the act of incorporation includes some territory that would not be included in a correct survey of the out-boundary as required to be run under the act of congress, and the surveyor has conformed to the act of incorporation, by including such territory. It may be answered that, in the main, the lines run are those required to be run under the act of congress; and this error (if it be one) does not so invalidate the survey, that land which is properly included cannot be legally assigned and set apart for the use of schools. It is not believed that such would be the legal consequence of such an error. If a survey is made in such manner that an error in it does not affect the rights of the parties at present litigating about a portion of the land embraced within the survey, the error does not vitiate the survey, so far as their rights are involved. If the land in controversy would be embraced in a correct survey of the out-boundary, then any alleged error in a part of the survey may be disregarded. In other words, the objection to the survey, to be valid, must be one that goes to the question, whether the land in controversy is correctly included in it. Nothing is said, nor designed to be said, upon the question, whether the incorporated town of 1812 or the Spanish town of 1803 is the town referred to in the act of 1812, because such question is not thought to be material to this case. Now, if this survey is examined in connection with all the evidence in the case, there is nothing discovered on which its correctness can be impeached, so far as the fact of including the land now in controversy is concerned. When we look to the law under which it was made, we find that the surveyor was required to survey and mark the out-boundary of the town, so

as to include the out-lots, common field lots and commons, where the same had not already been done according to law. This out-boundary might be a line that had already been surveyed and marked, or one that had never been surveyed and marked, or one that had in part only, been surveyed and marked. It was not required of the surveyor that there should be any work in the field in making the survey, where the line called for by this act was already ascertained and marked in the known and recognized surveys in his office. The survey of the out-boundary was not the survey of any tract of land for an individual. It was a survey of the exterior boundary of a town with its dependencies, its commons, in which all the inhabitants were interested, and the out-lots and common field lots in which those inhabitants were interested who were engaged in agriculture, or who owned land that had been held or used for that purpose. The design of the act was, that such out-boundary, though called the " out-boundary line of the town," should be so run as certainly to include the out-lots, common field lots and commons " belonging to the town ;" and in running this boundary at the time it was first commanded to be run, no person was interested but the government on one side, and the inhabitants of the town on the other. Whether it should include a greater or less extent of territory—whether a particular piece of vacant ground should be included or not, could, at that time, only interest those parties ; nor was the right of any party, who then claimed title to a piece of ground, affected by the fact, that it was included within such line, for, if he rightfully claimed it then, his right to it would still continue.

7. The surveyor, in performing the duty in relation to the boundary, was, of course, to ascertain from all sources of information, what land was to be embraced within the survey, either as out-lots, common field lots, or commons. He was then to run one boundary line, including all the land of either description. That the act contemplated one continuous out-boundary line, and not separate surveys of the town, and of

the common field lots, out-lots and commons, is evident from the direction to survey an out-boundary of the town, *so as to include* the lots and commons thereto belonging, and from the limitation in the proviso to the second section, of the quantity of land reserved for the use of schools, to one-twentieth of the whole lands included in the "general survey" of the town.

In the discharge of this duty, the surveyor, as appears from the survey before us, commenced at a point on the river where the common fields came to the stream, and running around the common field of St. Louis until he intersected the line which was part of the limits of the incorporated town, he followed that line until he came to the line of the commons, and then, following the line of the commons, he ran on to the river, and with the river to the beginning. The effect of running the line on the west, for a short distance, so as to leave the line of the common field, and pursue that of the incorporated town, could have no effect upon the question, whether the premises in controversy are rightly included in the general survey, and whether the survey was, in that particular, erroneous or not, does not affect the title to the premises. When the surveyor arrived at the river, at the south-east corner of the commons, he followed the river as the closing line of the survey, because on the river were lots which had been confirmed as out-lots of the town. Such were that confirmed to Susannah Dubreuil, under Sarpy, lying below the town, marked survey No. 374, and that to Mullanphy, under Eglise, above the town, and other pieces which had been granted by the Spanish Lieutenant Governor, bounded by the river, and which appear to be of the same description of tracts or lots. It will be seen, on examining the survey, that the river is taken as the eastern line, as well where it is the line of the incorporated town, as for more than a mile above the point on the river from which the line of the corporation commences.

8. Taking this survey, then, to have rightly included the premises in controversy, we come to the most difficult question

in the case, which is, whether the property assigned to the public schools was of that description which, under the second section of the act of 1812, was reserved for the use of schools. Upon this question, there has been not only a difference of opinion among the judges who have sat in this court, but the same judges have sometimes doubted the correctness of opinions they had before expressed. The question, when generalized, is, whether all vacant ground found to be within the survey of the out-boundary, was intended to be reserved for the use of schools, or whether the reservation is confined to such ground as had, before the change of government, been actually designated and in some mode separated from other property, so as to be a town lot, out-lot, or common field lot, under the Spanish government. In the case of *Trotter* v. *The Public Schools*, 9 Mo. Rep. 69, it was distinctly held, that the intention of congress was to reserve all the vacant ground included within the survey of the out-boundary. In *Eberle* v. *The Public Schools*, 11 Mo. Rep. 257, a different view of the question is taken by one of the judges, who held that the reservation did not extend to any vacant spaces within the general survey, but only to such parcels of ground as were known as "lots" in the sense in which that word was applied to the lots confirmed. Another judge, maintaining his first opinion, that whatever vacant ground was included in the general survey, was reserved for schools, expressed the opinion that the out-boundary should include nothing but the lots and commons, as the lots were known under the Spanish government.

Judge Tompkins, who was in all phases of this question, the most earnest and almost vehement supporter of the opinion, that no property could be legally assigned and set apart for the use of schools, except that which, prior to the 20th December, 1803, had, by the action of the Spanish authorities, assumed the definite form and shape of town lots, out-lots, or common field lots, remarks, in his separate opinion given in *Hammond* v. *The Public Schools*, 8 Mo. Rep. 86, "from all that I

have been able to collect of the practice of the Spanish authorities at St. Louis, as well from the testimony in this cause as in others that have been in this court, they never, for many years, did lay out lots, but on the application of those who demanded them, either for cultivation or residence. If that be the case, it necessarily follows, that there would be no vacant lot about or in St. Louis, unless it were abandoned by the person for whom it had been laid out." Again, at page 87, he says : " I therefore conclude, that congress did not intend to give to the town of St. Louis any land, except what was known and marked out by survey of the proper officer, as a town or common field lot."

So far as known, the town was not laid out, as is common at the present day, by a survey of a tract of land into squares and lots, with regular streets running through the tract thus laid out, and intersecting each other. And on the copy of the old map in the recorder's office, which was drawn by Auguste Chouteau, exhibiting the line of fortification, it is apparent from the certificate of the recorder, that there was, when that map was made, no projection of cross streets west of Third street, so that whatever of the Spanish town had existence subsequently, west of that street, was created alone by grants. Now, if, instead of the town having definite boundaries by a previous survey of a limited space of ground into squares and lots with streets, there was a piece of land bounded on the west by the common fields, into which the streets were to be projected, and where lots were to be granted upon such projected streets as they were asked for from the government officers, it is difficult to find any good reason for saying that such ungranted residuum cannot be treated as town lots ; and if it exist now, why it should not now be divided into appropriate squares and assigned to the schools, or assigned as a whole.

Or, if we suppose that a tract existed within the common fields, which never was a common field lot, in the sense of having ever been granted or surveyed as such, but was a space left ungranted in the common field, because it was unfit for

cultivation, but having.the same east and west lines as the common field lots granted, and being in between those which were granted and surveyed, it has the same shape as those lots that were surveyed—was it then a common field lot? It is not supposed that there would be any difficulty in saying, that it clearly comes within the intention of the act of congress in reserving such land for the use of schools, although it never had been surveyed.

9. It is altogether probable, that, in relation to the inconsiderable villages existing in the territory of Missouri as early as the year 1812, which had their origin under the former government, the congress of the United States had but very limited information; and that but little was known of the manner in which the property in and around these villages was held and occupied. There were no public offices, in which, as with us, connected maps and surveys would exhibit the situation and size of the villages, or the position and relations of the different tracts of land in which the villagers were interested. The information upon which congress must act could only be obtained from intelligent individuals, in whom the government could place confidence. The information upon which the act of June, 1812, was based, was obtained from Mr. Penrose and Mr. Riddick, one a commissioner, and the other the secretary of the board, which had just then closed its labors. The information was contained in letters addressed to the secretary of the treasury and to the chairman of the committee on public lands, which will be found in the second volume of State Papers by Gales & Seaton, 448 and 451. These letters have been so often referred to, and parts of them copied in former opinions, that they will not now be copied. In them is found the idea of the .out-boundary, and the confirmation of individual claims, and the reservation of vacant property for the support of schools. The congress may have supposed that the property belonging to the villages was in such compact shape, that an out-boundary line would include nothing but town lots, out-lots, common field lots and com-

mons, and the probability is, that such was their belief. In that view, the act was so constructed as to dispose of all within the out-boundary directed to be run, and it is supposed to be the clear intent that all within the out-boundary should be disposed of, either to individuals, or to the aggregate inhabitants, for commons and the support of schools. This is perfectly apparent from the descriptions of property directed to be included within that boundary. But when it is discovered that a boundary, so run as to include the property thus mentioned, will also include other property, which had not been divided into lots, there is no warrant in the law, either to refuse to run the boundary, or to break up the survey into separate surveys of the town, and of the out-lots, and common field lots, and commons, in order to avoid including such property. When it is so run as one boundary, the vacant property included within it, is still within the general intent of the act, which, as before stated, is to dispose of all property thus included.

10. But the question then arises, whether the language of the act admits of our giving effect to this general intent. The reservation is, of " all town or village lots, out-lots or common field lots included in the survey, and not rightfully owned or claimed by any private individual, or held as commons belonging to the towns or villages."

As far as appears upon the evidence in the case, there has been no act of the Spanish officers in relation to this property, surveying it as a lot of any description, otherwise than by surveys of the adjoining property which bound it on all sides but the one which fronts the river ; nor is there any declaration, or expression, in relation to it, found in any deed, grant, survey, or other document made under the Spanish government. It is claimed that it comes within the reservation as an out-lot. Now it is true, that if an inhabitant of the town had asked the Lieutenant Governor to grant this ground to him, that he might pasture his horse or his cow in it, it would in all probability have been granted to him, and then, because of its close proximity to the town, and its relation to other de-

pendencies of the town, it would in all probability have been confirmed to him as an out-lot of the town. Such certainly has been the fact in relation to other property farther separated from the town, and having no more connection with any other lots of like description, as appears as well by the examination of the recorder's report, confirmed by the act of 29th April, 1816, as the action of the recorder under the act of 26th May, 1824. Now, if this lot would have been properly described as an out-lot, upon its being granted to an individual, and might, consistently with the practice of the government, have been confirmed to the individual claimant as an out-lot, is it less an out-lot within the true intent of this reservation, because it never was granted but remained vacant? The term "out-lot" is said to be of American origin, and to be unknown to those who preceded us in the possession and government of this country. If this be so, we would naturally look for an American interpretation of it, and if the public authorities, from congress to the recorder, have applied it to property situated in relation to the town, just as that now in controversy was situated, we would have the signification of the term conveyed in the most forcible manner. It is conceded in the argument filed for the plaintiff in error, that the recorder has in his reports designated not only common field lots, but grants elsewhere near the town, as "out-lots." These reports have been confirmed by congress, and persons hold the property thus confirmed to them as out-lots. Now, this language thus used in the reports, applies to property situated, some below this piece on the river, some above the town, and to one piece in the commons entirely unconnected with any other survey, and if this exposition of the term is to be taken as that which the government itself gives, it would seem at least to justify the commissioner of the general land office and the surveyor, acting under his instructions, in setting apart this property for the support of schools. It is certainly a very doubtful position, that the property which is reserved is only that which had been actually surveyed and divided off into lots

by the Spanish government. In the midst of the conflicting opinions which have been expressed in relation to the extent and subjects of the reservation, great influence should be allowed to the action of the land department of the government, in the recognition of the right of the inhabitants to hold this and other property similarly situated, for the support of schools. The department has recognized this property as reserved by the act of 1812. It is true that it is not said in any of the documents that it is a town lot, or an out-lot, or a common field lot, nor was it necessary, in order to pass the title, that such statement should be contained, either in the instructions of the commissioner, or in the designation of the surveyor.

The department has acted upon the opinion, that whatever was rightly embraced in the survey of the out-boundary was intended to be disposed of by the acts of congress, and having recognized and approved a survey that includes the premises in question, the result was readily attained, that this property, not being rightfully claimed by any individual, was to be appropriated to the support of schools. Judges sitting in this court have concurred in that opinion, and it would only be upon the clearest conviction that it is erroneous, that a contrary judgment should now be pronounced.

It is to be observed that the shape in which the objections now appear, is that of objections to the validity of a title clothed with the forms of law. If they are not in their own nature legal objections, or if there is not evidence in the case on which they can be raised, they must be ineffectual and the title of the plaintiffs must prevail.

The points considered and decided, and for which the reasons are before given, are the following :

1. It is maintained that the survey, designation and setting apart for the support of schools of a piece of property described to be within the out-boundary of the town, as directed to be surveyed under the act of 13th June, 1812, taken together with the act of 1831, make a regular formal title to the property so set apart.

2. That the entry of the same land with the register and receiver must yield, in an action of ejectment, to the title under such designation.

3. That if the purchaser, under such entry, is allowed to go behind the act of setting the property apart for the support of schools, in order to question the legality of the act, he must show it to be entirely without authority of law, in order to have benefit from such impeachment of the title.

4. That the designation in this case is not void by reason of any defect apparent on its own face.

5. That the first section of the act of 1812 contemplates a continuous out-boundary of the towns, to be so run as certainly to include the out-lots, common field lots and commons of the towns.

6. That the fact that the survey of such out-boundary includes too much or too little land, does not invalidate the survey, as to any property, which is rightly included within it, and there is no evidence in this case impeaching the correctness of the survey, in including the premises in controversy.

7. That the fact that the survey in the present case professes to be a survey of the incorporated town, with the out-lots, common field lots and commons, does not invalidate it.

8. That the act of 1812 was designed to dispose of all the property included within the out-boundary of the towns.

9. That it was not necessary, in order that the property included within the out-boundary should be reserved for the support of schools, that it should have been surveyed into town lots, out-lots or common field lots under the Spanish government.

10. That the property described in the survey and designation in this case, might properly have been set apart as an out-lot, according to the practice of the government, as shown in evidence on the trial.

Although the instructions asked by the defendant are not commented upon, it is believed they are covered by the principles thus stated.

From these positions it follows, that the defendant has failed to impeach, successfully, the title of the plaintiffs. On some of these points, there has been hesitation in giving an opinion that differs so far from those expressed by other Judges of this court on former occasions, and it is hoped that, as this case depends entirely upon the construction of laws of the United States, it will be taken to the tribunal in which such questions may be finally settled.

The judgment is, with the concurrence of Judge Ryland, affirmed.

Scott, Judge, dissents, and refers to his opinion in the case of *Eberle* v. *St. Louis Public Schools*, 11 Mo. Rep. 257.